# ROCKWELL *v.* CAPITAL TRACTION COMPANY.

---

APPEAL AND ERROR; BILL OF EXCEPTIONS; SEALED INSTRUMENTS; RELEASE PROCURED BY FRAUD; CONSIDERATION, RETURN OF; QUESTIONS FOR JURY; RATIFICATION; CHAMPERTOUS AGREEMENTS.

1. The requirement that a bill of exceptions must show that all of the evidence has been set forth, in order to warrant an appellate court in determining whether there was error in giving or refusing an instruction to direct a verdict, is sufficiently complied with, where the bill of exceptions purports to recite the evidence in the order of its introduction, giving the name of each witness; stating that the action of the court in directing a verdict for the defendant was "founded on all the evidence as above set forth on behalf of the plaintiff," and that

each of the questions reserved by the plaintiff during the trial was upon the whole evidence, "the substance of which whole evidence is included in the bill of exceptions."

2. A note to a bill of exceptions, reciting that the plaintiff submitted a briefer bill, but it was objected to by the defendant, who submitted another which the plaintiff admitted was accurate, but protested was too long, whereupon, in view of such admission, the longer bill was settled,—does not make the bill settled that of the defendant, so as to preclude it from objecting to its sufficiency, but may tend to show that none of the evidence material to the determination of the error assigned, namely, the direction of a verdict for the defendant upon the whole evidence, was omitted.

3. Where a seal is affixed to the signature of a husband on an instrument signed by himself and wife, while none is affixed to the signature of the wife, but the instrument contains the recital, "given under our hands and seals," the presumption is that the seal affixed to his signature was adopted by her also, and the instrument will be regarded as the sealed instrument of both.

4. The decided tendency of modern decisions is to minimize the old distinctions between sealed and unsealed instruments, where they have not been entirely abrogated by legislation.     (Following *Lyons* v. *Allen*, 11 App. D. C. 543.)

5. A plaintiff may defeat the operation of a sealed release pleaded in bar of her action at law, by showing fraud in its procurement, whether there was actual misrepresentation of its character and purport, or not, —especially where the operation of the release would have been as effective at law without as with execution under seal.

6. Whether it is sought to avoid the bar of a release on the ground of misrepresentation of the character and purport of the instrument, or because of fraud in the manner in which its execution was obtained, it is time enough in either case to make a tender of the return of the consideration after the release has been pleaded in bar.    (Distinguishing *Lyons* v. *Allen*, 11 App. D. C. 543, and following *Chesapeake & O. R. Co.* v. *Howard*, 14 App. D. C. 262.)

7. If a woman injured in a street railway accident was, while in a weakened and nervous condition resulting therefrom, induced to sign a release of all claims against the railway company under the belief, produced by declaration of her husband in the presence of the company's agent, who neither contradicted nor explained it, that its execution by her husband made it operative to destroy any right of action that she might have, such a release will not bar a recovery by her of damages from the company; and evidence that at the time she signed she was in bed suffering considerable pain, and that she was

weak and nervous, and weeping under the strain, is entitled to weight in determining whether she signed it under such false impression.

8. The evidence in such a case as to the circumstances under which the release was executed, held to be of such a contradictory character as to require submission to the jury, and the trial court held to have erred in directing a verdict for the defendant.

9. Using money and cashing a check received in consideration of the execution of a release of claims against a railway company for injuries received in an accident, if done when the party executing the release was under the same impression that she was when she signed the release, namely, that its execution by her husband made it operative to destroy any right of action she may have had, will not show a ratification of the release as matter of law, as one cannot waive or acquiesce in a wrong while ignorant that it has been committed.

10. Evidence by the defendant in an action against a street railway company to recover damages for personal injuries, tending to show that the plaintiff had not furnished the deposit for costs, or money tendered to the defendant to repay that received at the time of the execution of an alleged release, is irrelevant and inadmissible over the plaintiff's objection.

No. 1433.   Submitted January 24, 1905.   Decided March 7, 1905.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia upon a verdict directed by the court in an action to recover damages for personal injuries.                              *Reversed.*

The COURT in the opinion stated the case as follows:

This is an action to recover damages for personal injuries sustained by Ida I. Rockwell while a passenger on the cars of defendant, November 15, 1898.  The declaration was filed May 23, 1900.   In addition to the general issue, defendant pleaded a release executed by plaintiff and her husband, under seal of November 23, 1898, wherein, for the sum of $85 paid them, they released and discharged the said cause of action.  Replication filed February 26, 1901, denied under oath that the release was plaintiff's deed.  On January 13, 1903, a mistrial was had, and the entry thereof recites that "plaintiff made a

tender of the sum of money received by her from the defendant
at the execution of the 'satisfaction' herein pleaded, with inter-
est, which was refused." Thereafter the aforesaid replication
was, by leave of the court, withdrawn and another substituted
therefor. This alleged that the release had been obtained
through misrepresentations made, and fraud practised by de-
fendant's agent; and, further, that plaintiff's husband had been
induced to execute the same through fraudulent misrepresenta-
tions, and that plaintiff had likewise been induced to execute
the same while sick and in a nervous condition, and through
misrepresentations made to her as to the effect of her husband's
discharge, she being ignorant of her rights, etc. The defendant
thereafter withdrew its plea of the general issue. Issue was
then joined upon defendants' pleas of release and accord and
satisfaction, and upon the plaintiff's replication.

Plaintiff introduced evidence tending to show that on Novem-
ber 15, 1898, the car of defendant stopped to take on pas-
sengers; that, after she had taken hold of the handle bar and
was attempting to enter the car, it was negligently started, and
she was dragged and her arm badly strained; that she returned
to her home and suffered great pain; that she was confined to
her bed and house for some time, and had her arm bandaged by
a surgeon; that she has continued to suffer great pain to the
present time, and has been unable to labor, etc. Two surgeons
testified to the injuries of the plaintiff, saying that her arm had
been bandaged and placed in a plaster cast for about six months.
They further said that an indentation in the hand was probably
due to neuritis; that the injuries were severe and painful; and
that plaintiff would probably recover in a year or two. De-
fendant introduced no evidence relating to the accident, but of-
fered as witnesses two surgeons whose evidence tended to show
that they had examined the plaintiff's arm in January, 1903,
and found nothing to indicate that there was any neuritis at
that time or effects thereof. Plaintiff also proved the former
tender of $85, with interest, and renewed the same, including
costs, which was again refused.

The case was made to turn upon the evidence relating to the

execution of the release pleaded by the defendant. The release bears date November 23, 1898, and is a printed form designed for execution by one person. The blanks and certain inter-lineations made necessary by the double execution were written in by defendant's agent. In consideration of $85 it releases to the defendant all actions or causes of actions which "we or either of us now have against it by reason of an accident which occurred on the 15th of November, 1898, at Tenth street and Pennsylvania avenue N. W., Washington, D. C., resulting in injuries to my wife's arm," etc.

It concludes: "Given under our hands and seals this 23d day of November, 1898." It is executed first by W. G. Rockwell on a line at the end of which is printed the word "seal." Underneath occurs the signature of plaintiff thus: Mrs. Ida Rockwell [her X mark], and under the printed word "witness" is the signature, "Mrs. Irene Lucas."

It was undisputed that plaintiff's name was written by Irene Lucas, her sister, who also signed as the witness. The words "her mark" were written by defendant's agent. There is no seal of any description opposite the signature of plaintiff. Many pages of the record are filled with the examination and cross-examination of the witnesses introduced on the matter of the release, and the substance of the same will be given.

Plaintiff testified that she was in bed suffering pain when defendant's agent called, about a week after the accident. He said that he represented the defendant, and inquired of the accident, number of the car, etc. He also inquired as to her husband, his occupation, and place of business. Very little else was said. He returned next day about 2 o'clock. Plaintiff was in bed suffering pain; was in a nervous condition and had been taking medicine to relieve pain. Her sister, Mrs. Irene Lucas, and Mrs. Ready were in the room. He said the company wanted to do right; told him she did not know how badly she was hurt, and if not badly injured would only want her expenses. He repeatedly asked her to fix a price, and she as often declined to do so. He asked if $50 would do and she made no answer, but turned her back. Mrs. Ready told him that plaintiff was

in no condition to talk, was in no immediate need, and he would
better come again when she was not so sick. He went away and
returned about a half hour later with her husband. He came to
the bed and said, "I have your husband's signature; will you
give me yours?" She said, "No." He had not shown a paper
before. He said, "I have your husband's signature; will you
sign it?" She said: "No, sir; I will not." Her husband
"ripped out that, 'You sent that man around there to me and
made me make a —— —— fool of me—worse than that —,
and now I have signed the paper, and your rights are gone, and
if he goes away you won't get a penny with my signature on
it.' My husband then ran down the steps, and slammed the
door, and left me alone with the lawyer—with Mrs. Ready and
them in the room, but he went out and left me. So I was awful-
ly excited and nervous, and I raised up and said, 'Oh! I don't
care what you do,' and I raised up as if I would sign, but
whether I ever touched the pen—I don't remember even seeing
the pen, and I know that I don't know one word on the paper.
I have never seen it except as he came towards the bed with it
to me." After what her husband had said the agent said noth-
ing, but asked her to sign the paper. She said, "I don't care
what you all do; I don't care what you do." She turned her
back. Does not remember touching the pen or anything but
raising up and then lying down. Had her face turned to the
wall and was crying. Had not told the agent to see her husband,
and did not know that he was going to see him. She was not
permitted to answer what her belief was then as to her rights
after her husband had signed. That she gave no one authority
to put her mark to the paper. She did not know if the agent
offered money. She did not accept any. Had her back turned,
was crying and paid no attention. He left a check and some
money on the bureau. It lay there until next evening and some-
one put it in the cupboard. Was angry and vowed she would
never touch the money, and that she had never touched the pen.
Cashed the check about four weeks after because of her ex-
penses. "I thought that my rights had gone, that I could do
no different, and I might as well use it. When I used the check

I thought that I could do no different, that my rights were gone, and it was no good to keep it." The money—five dollars and some cents—was first used.    That it was months after that she learned that the action of her husband had not ended her rights.

She went to see a lawyer about  seven  months  afterwards.

Upon cross-examination the following letter was shown her:

"Washington, D. C., November 17, 1898.

"President Dunlop.

"Dear Sir:

"On last Tuesday, November 15, as entering one of the cars, No. 217, of the Capital Traction road, at Tenth street and Pennsylvania avenue, about 4 p. m., with friends, I was thrown backwards, receiving severe injuries, from which I am still suffering.    The cause of same was that the car was started before I was fully aboard.    Having heard nothing from your company in regard to same, I will be pleased to do so.

"Yours respectfully,                   ·

"Mrs. Rockwell,

"Per T. A. Robertson.

"No. 1117 Twenty-second street northwest,

Washington, D. C."

Said she had never seen the letter, but had suggested it and knew that it had been written.    Miss Robertson was a neighbor who had called in,—she was her cousin.    Did not intend the letter as an invitation to come to see her, but wanted the defendant to know whether they would send or not.    Thought she had to let them know about it.    Expected she wanted someone to come to see her, and suppose the agent came because of it. Thought she could not bring a suit without letting them know. Wanted to tell him of the accident.    Did not want payment of money at the time.    My cousin said I would better let them know.    The following question was asked her:    "Did you not know, when you got that check three weeks afterwards, that it was given you on the faith of that being your signature to that paper, whatever the effect of it was, and whether it was valid or not; that that check was given to you on the faith of that being your signature to that paper?"    She answered:    "I knew

that he had said that he had a mark on there, and that we had the money, and there was no good doing anything after that." Did not remember that Mrs. Lucas asked permission to sign her name to the paper.

W. G. Rockwell, husband of plaintiff, testified that a man came to Walter's store where he was employed. Said he represented the railroad company, and had been to the house to see plaintiff, and wanted to do what was right for her. That she had left it all to witness, and he had come to see him. Was busy and had some talk about the price. Asked him $100 or something, and we got it down to $85. Signed the paper and he asked me to go to the house with him. When we got there it appeared that plaintiff knew nothing about it. She would not sign. Thought she had sent him to me to fix it up. "I said something about a 'nice way to send a man around to me and make a —— ass of me; I have signed the paper, now if you don't put your name on it you won't get anything,' and I went out." Left defendant's agent there. Mrs. Irene Lucas was called as a witness, and corroborated the plaintiff's evidence relating to the first visit of defendant's agent. Regarding the second and third interviews, she said:

"I was over there doing work for my sister, and Mr. Dunlop came in, and he told her he had come to see what he could do for her, and Mrs. Rockwell said she didn't want him to do anything for her; that she didn't know how badly she was hurt. He says: 'Well,' he said, 'you know, Mrs. Rockwell, we have so many of these little cases that we want to get them off our hands as soon as possible;' and he says: 'Don't you think that $50 will be a fair price?' She says: 'Why, Mr. Dunlop, I don't care for anything,' she says, 'I don't want anything unless I am hurt badly, and if I am, why, of course, I will expect you to pay what is right.' And she says: 'As far as now is concerned, I am in no condition to talk to you.' And he stayed there for quite awhile, and kept on until she got real nervous, and Mrs. Ready advised him to go away and come back some other time; but he kept on raising the price until he got up as high as $85, I think. I am not positive whether it was that, or

it might have been less; it was not more, and Mrs. Rockwell kept on refusing to take it, and I was getting dinner; and I went out of the room off and on, and I don't remember anything then, only that he went out and said he would come back.

"When he came back Mr. Rockwell came with him; and Mr. Rockwell came in behind Mr. Dunlop, I am sure, and kind of stood in the doorway, and Mr. Dunlop at the foot of the bed. And Mr. Dunlop says: 'Mrs. Rockwell,' he says, 'I have your husband's signature to this paper,' he says, 'Will you sign it?' She says, 'No, I will not;' and Mr. Rockwell became angry, and he said this what they have said before; I won't repeat that; and he ran down the steps and shut the door. And Mr. Dunlop, he stayed there, and he told her that he thought she had better sign it; that Mr. Rockwell had signed it, and she ought to, and she said: 'Oh,' she said, 'I don't care what you all do,' and she threw herself back in the bed and commenced to cry. And Mr. Dunlop stood there for a minute, and so he said, 'Aren't you going to sign, Mrs. Rockwell?' and she says: 'No,' she says, 'I am not going to sign;' and I went out of the room to attend to the dinner, and when I came back Mr. Dunlop said: 'Mrs. Lucas,' he says, 'I want your name as a witness; I want you to sign as a witness,' and I am not positive, but I think, he says, 'sign your sister's name, too,' and I signed the paper. Now, whether I signed her name or mine I don't remember, but I know that I signed my own name."

She further said that plaintiff was lying with her face to the wall crying. "She did not say one word to me at all, and I took it for granted that it was all right, and that the time I had been in the kitchen they had come to some agreement." He offered some money to Mrs. Ready, who refused to take it. He offered it to witness, and then laid it on the bureau and went out. Mrs. Ready, in refusing to receive the money, said she did not think it was right; that she thought an undue advantage had been taken of the plaintiff, and she would not have anything to do with it. Plaintiff was in a great deal of pain, and had taken something to quiet her nerves, which Dr. Moran had prescribed. She identified her signature as a witness, and said that she wrote

plaintiff's name. The agent handed witness the paper, and said he wanted her signature as a witness. Signed where he said. Told her to write plaintiff's name. Did not tell plaintiff; supposed that she knew. She did not see because her face was to the wall. Did not ask her about it. Did not see her touch the pen.

Mrs. M. J. Ready testified as follows:

"I was not present on both occasions when Mr. Dunlop called. I was not there the first time; I was the second. When Mr. Dunlop came in he just simply said he had come to make some agreement about the accident, and Mrs. Rockwell said that she did not feel like talking about it that day, you know, that she was in no condition to talk. He just simply said that he had come to make some agreement, don't you know, and do the best that he could, and asked her what amount she thought would be right to take, and she said she did not know. So he said—he asked her if she thought $50 would be right, and she said no, that she would not take $50; that if she was not badly hurt, she did not want any more than expenses, but if she was, why she thought that they ought to do what was right by her.

"Then he went on to say $60, I think, or he went as far as, I think, $80. Then she just simply turned over and said that she did not care to talk about it, and I told him that I thought he should leave and call another day, as I did not think she was in any condition to talk on the subject, and as she was not in any immediate want, that it was not necessary to have a settlement. And he said that he had so many of these cases that he would prefer settling it right then and there, so as to clear it right up.

"So, anyway, he talked just on that subject, for a while, and finally he said that he would go away and that he would call again. So in a few moments he returned with Mr. Rockwell, and he asked Mrs. Rockwell to sign a paper, and she said no, she would not; and Mr. Rockwell then uttered an oath, you know, and said that she had sent that man around there, and if the paper went away with his signature on it, without hers, she would not get anything.

"So Mr. Dunlop walked to the bed and asked her if she would sign, and as he did I turned towards the window, and I did not see whether she did or not. I never noticed any further than that. Then, in a little while, Mrs. Lucas came into the room, and I heard Mr. Dunlop ask her if he might have her signature to her sister's cross, or something—at first he came to me and asked if he might have mine. I told him that I did not care to have anything to do with the case at all, and then, when Mrs. Lucas came in the room, why she gave her signature, as Mr. Dunlop asked her to. Then he wrote a check, I think, at least he came over to me and offered me the check, and I told him, as I had told him before, that I did not care to have anything to do with it, and so he laid the check on the dresser, and he went out.

"I do not remember anything at all being said by Mrs. Rockwell to Mr. Dunlop or by Mr. Dunlop to Mrs. Rockwell about Mr. Dunlop's going to see her husband. Mrs. Rockwell seemed to be suffering a great deal, and she was just tossing from one side of the bed to the other, and did not seem to be in any condition to be annoyed, as I had told Mr. Dunlop at the time. He said he had so many of these cases to settle that he would like to have this cleared up as soon as possible. As nearly as I can recollect, Mr. Dunlop was there about half an hour, probably a little more. I don't know."

As the motion to withdraw the case from the jury was founded on the insufficiency of the plaintiff's evidence relating to the execution of the release, it is unnecessary to set out the evidence on behalf of the defendant on this point. It is sufficient to say that it consisted of the testimony of the agent who effected the settlement and received the release; and that it contradicted the evidence offered by the plaintiff tending to show undue advantage taken of her condition.

He said that he paid his first visit because of plaintiff's letter, and heard her statement as to the manner in which she had been hurt, the time, place, and number of the car. That he said the defendant wanted to do what was right, etc. That upon the second visit he found plaintiff in good condition to talk, and

agreed with her on $75. That she referred him to her husband and gave his place of business. That he called to see the husband, who wanted more, but finally agreed with him on $85. That he then interlined and filled in the blanks of the printed form with pen and ink furnished by the husband, who then signed the same. That he asked the husband to go with him to see his wife execute the release; wanted him to explain to her the change from $75 to $85, and to know that everything was properly done. That when they returned, plaintiff demurred and said she ought to have more money. That he reminded her of her agreement, and she said she did not know how long she might be laid up, and ought to have more. Her husband was in a hurry and impatient and said, without using an oath: "Why I thought you had agreed on this amount. I haven't got time to fool around here. I have got to go back. I can't stay around here. I have signed this paper and agreed on this, and you will either take that or nothing. I haven't got time to fool." He then went out; that he asked plaintiff what she would do. She made no reply. That he said: "We will have to do one thing or the other. We will have to do something now. I cannot stay any longer." She said: "Well, I guess I will have to take it." That he then said if agreeable she could sign the paper, and he asked for pen and ink. She asked Mrs. Lucas to get them, and the latter went into another room and brought them. Nothing was said during this interval. The release was read to her slowly and accurately. She raised up to sign, but could not use her hand and said: "Let my sister sign it for me." Mrs. Lucas wrote plaintiff's name, witness wrote the words "her mark," and plaintiff touched the pen and made the mark. Mrs. Lucas signed as a witness. Mrs. Ready was not in the room at the time. That he took the release, laid $5.75 in cash on the bureau, which she said do, and a check for $79.25. The check was payable to the agent's order and indorsed by him. It showed that it had been paid December 3, 1898.

Defendant introduced a witness whose evidence tended to show declarations made by the plaintiff afterwards that she had compromised for $85, but that she now

wanted more money, etc. This witness and another undertook to impeach plaintiff's reputation for veracity. Plaintiff introduced evidence in rebuttal tending to show enmity on the part of defendant's impeaching witnesses, and to contradict their statements; also to show that her reputation for truth was good. At the conclusion of the evidence, as shown by the bill of exceptions, the defendant "moved the court, on all the evidence as above set forth and given for the plaintiff, to instruct the jury to return a verdict for defendant." The motion was sustained, and from the judgment rendered on the verdict so returned the plaintiff appealed.

*Mr. Charles R. Merillat* and *Mr. Charles F. Carusi* for the appellant.

*Mr. R. Ross Perry* and *Mr. R. Ross Perry, Jr.,* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. A preliminary question arises on the objection of the defendant to the consideration of the error assigned on the action of the court in directing the verdict, on the ground that the bill of exceptions does not purport to set out all of the evidence. It is well established that, in order to warrant an appellate court in determining whether there was error in giving or refusing an instruction to return a verdict, the bill of exceptions must show that all of the evidence has been set forth. *United States* v. *Copper Queen Consol. Min. Co.* 185 U. S. 495, 497, 46 L. ed. 1008, 1010, 22 Sup. Ct. Rep. 761. In our opinion the bill of exceptions in this case substantially complies with that requirement. It purports to recite the evidence in the order of its introduction, giving the name of each witness. This evidence is given at length in each instance, and frequently recites both the questions and answers,—a practice which, in this last respect, has been disapproved. *District of Columbia* v. *Frazer,*

21 App. D. C. 154, 159.    As shown in the statement of the case, the recital of the action of the court in directing the verdict is. that it was founded "on all of the evidence as above set forth on behalf of the plaintiff."    There is a later recital in the bill of exceptions as follows:    "Be it further remembered that each of the several and separate exceptions taken by the counsel for the plaintiff to the rulings of the court during the progress of the trial, and the exceptions by the counsel for the plaintiff to the instructions of the court to the jury upon the whole evidence, the substance of which whole evidence is included in the bill of exceptions."

Moreover, the bill of exceptions presented by the plaintiff was objected to by the defendant, and the one signed was presented by the latter, as shown in the following note signed by the trial justice, and made a part of the same:

"Note.—Counsel for plaintiff submitted a briefer bill of exceptions, but counsel for defendant objected to said bill of exceptions as not setting forth the whole record, and submitted another bill of exceptions, which said other bill of exceptions. plaintiff admitted was an accurate record of the proceedings, but protested that the same was set forth at unnecessary length,. and was objectionable under the rules of the court of appeals. as embodying to too great an extent a literal transcript of the proceedings at the trial; whereupon, in view of the admission of counsel for plaintiff of the accuracy of this bill of exception,. and deeming it proper the record should be set forth with fullness, I settled and signed the above bill of exceptions."

We do not regard this note as making the bill of exceptions. that of the defendant, thereby precluding it from objecting to its sufficiency, and it has been recited merely as tending to strengthen the conclusion that none of the evidence material to the determination of the error assigned has been omitted.

The second recital of the bill of exceptions, before quoted,. was an unnecessary one, but whether so or not, in view of the fact recited in the note aforesaid, and the first recital that the instruction was given "on all the evidence as above set forth and given," it cannot be regarded as controlling the first one.

2. Several questions are involved in the determination of the error assigned on the action of the court in directing the return of the verdict for the defendant, and these will be considered in their order.

(1) Is the release of the cause of action to be regarded as executed by the plaintiff under seal? It will be remembered that the plaintiff's husband first signed the instrument, and that a seal is affixed to his signature; that none follows the signature of the plaintiff. Were this all, it might well be considered a sealed instrument in so far as the husband is concerned, without being one as regards the wife. But the instrument contains the recital, "given under our hands and seals," from which the presumption may be indulged that the seal affixed to his signature was adopted by her also. *Northumberland* v. *Cobleigh*, 59 N. H. 250, 252; *Burnett* v. *McCluey*, 78 Mo. 676, 688; 25 Am. & Eng. Enc. Law, p. 79. See also *Brown* v. *Commercial F. Ins. Co.* 21 App. D. C. 325, 336.

(2) Can the plaintiff defeat the operation of the sealed release pleaded in bar of her action at law by showing fraud in its procurement? We are of the opinion that she can. At a time, even, when the observance of the technical distinctions between sealed and unsealed instruments was more rigidly adhered to than now, it was permissible to avoid the obligation of a sealed instrument by showing that fraud or imposition had been practised in procuring the signature and seal. "The fraud in this aspect goes to the question whether or not the instrument ever had any legal existence." *Hartshorn* v. *Day*, 19 How. 211, 223, 15 L. ed. 605, 612.

While it may be that the present case does not fall entirely within the exception stated in *Hartshorn* v. *Day*, 19 How. 211, 15 L. ed. 605, because there was no actual misrepresentation of the character and purport of the instrument executed, we see no reason whatever for the maintenance of the distinction in the case of instruments of the kind under consideration.

The operation of the release was as completely effective at law without as with execution under seal, and the affixture of the seal was a superfluous act. The decided tendency of modern

decisions is to minimize the old distinctions between sealed and unsealed instruments, where they have not been entirely abrogated by legislation. *Lyons* v. *Allen,* 11 App. D. C. 543, 549. In that case it was said by Chief Justice Alvey: "Formerly this right of avoiding a release under seal, on the ground of fraud, in an action at law, * * * was generally denied, and the party was referred to a court of equity in jurisdictions where the remedies at common law and equity are separate. But it is now generally held by a great preponderance of authority that a release so set up as a defense may be avoided at law."

(3) Was it necessary, to entitle the plaintiff to avoid the release on the ground of fraud, that she should have offered to return the consideration received, before bringing her action for the injury? We have heretofore held that a return, or an offer to return, must be made in order to avoid such a release. *Lyons* v. *Allen,* 11 App. D. C. 543, 549, 552. But in that case no offer to return was made either before or after the beginning of the action, and the amount received on the execution of the release was permitted to be set off in the verdict.

In another case it was held that the tender of the return of the consideration, made during the trial of the case, was sufficient. *Chesapeake & O. R. Co.* v. *Howard,* 14 App. D. C. 262, 297; 178 U. S. 153, 167, 44 L. ed. 1015, 1020, 20 Sup. Ct. Rep. 880. In that case, as in this, the release was obtained from a woman suffering great pain from a recent injury, and the plaintiff's evidence tended to show that she did not understand the instrument to be a release of her cause of action, but a mere receipt for money given to help her. It is sought to distinguish that case from this, because here there was no misrepresentation of the nature of the instrument, and the alleged fraud consists solely in the manner in which its execution was obtained. As intimated in that case, though not considered necessary to its determination, we are not satisfied with the soundness of any such distinction as affecting the time of the offer to return the consideration.

If, in case of a contract procured in either way, the signer should bring an action of deceit or a suit to cancel, she would be

compelled to return, or offer to return, whatever she had received as the condition of its maintenance.   In the one case the signer might not reasonably be expected to tender the return of money and bring a suit to rescind, because of the belief that she had received the money as a gift and had executed nothing more than a receipt for the same, at least, until informed that the instrument was in fact a release and held as such.   If informed of this fact in advance, what would be the substantial difference between her situation and that of the plaintiff in this case? Each instrument is operative to the same extent if untainted by fraud, and equally inoperative if so tainted.   If procured through fraud, neither party is required to sue for cancelation, but may impeach its validity when offered in defense to an action at law.   And we see no good reason why one party more than the other should be required to anticipate a defense founded on the instrument, and offer to return the consideration as the condition of bringing the action.   We are of the opinion that it is time enough to make the tender in either case after the release shall have been pleaded in bar.   Tender or offer to return then accomplishes all the purposes for which it is required at all.

Some of the cases to which our attention has been called, where the doctrine has been declared that tender or offer to return is a condition precedent to the institution of the suit, were either suits to rescind, or suits in courts of blended jurisdiction where cancelation was part of the remedy sought.   *Lumley* v. *Wabash R. Co.* 71 Fed. 21; *Strodder* v. *Southern Granite Co.* 94 Ga. 626; *Herman* v. *Haffenegger,* 54 Cal. 161.   In others no tender had been made at any stage of the proceedings.   *Norwich Union F. Ins. Soc.* v. *Girton,* 124 Ind. 217, 24 N. E. 934; *Potter* v. *Monmouth Mut. F. Ins. Co.* 63 Me. 440; *Pangborn* v. *Continental Ins. Co.* 67 Mich. 683, 35 N. W. 814; *East Tennessee, V. & G. R. Co.* v. *Hayes,* 83 Ga. 558, 10 S. E. 350; *Drohan* v. *Lake Shore & M. S. R. Co.* 162 Mass. 435, 38 N. E. 1116; *Brown* v. *Hartford F. Ins. Co.* 117 Mass. 479; *Louisville & N. R. Co.* v. *McElroy,* 100 Ky. 153, 159, 37 S. W. 844; *Hill* v. *Northern P. R. Co.* 51 C. C. A. 544, 113 Fed. 914, 916; *Och* v. *Missouri, K. & T. R. Co.* 130 Mo. 27, 36 L.

R. A. 442, 31 S. W. 962. In the case last cited there was a replication of fraud in the release pleaded by defendant, but no offer to return the consideration. The majority of the court expressed the opinion that in the action at law, unless the execution of the release was obtained by fraud, a tender should have been made. It was further said, however, that the "petition might have been amended, before or at the trial, upon proper terms, by adding a count in equity to set aside the settlement." *Gould* v. *Cayuga County Nat. Bank,* 86 N. Y. 75, was a case very unlike the present one, and the tender therein made during the trial was a qualified and conditional one. Substantially it was nothing more than an offer of credit upon the recovery sought.

On the other hand, many cases, some of which are cited, expressly decide that the offer to return may be made after the institution of the suit and while it is pending. *O'Brien* v. *Chicago, M. & St. P. R. Co.* 89 Iowa, 644, 57 N. W. 425; *Chicago, R. I. & P. R. Co.* v. *Lewis,* 109 Ill. 120; *Chicago, R. I. & P. R. Co.* v. *Doyle,* 18 Kan. 58. See also *Union P. R. Co.* v. *Harris,* 158 U. S. 326, 331, 333, 39 L. ed. 1003, 1005, 15 Sup. Ct. Rep. 843. In that case the release pleaded by the defendant was attacked for fraud in its execution. A meager statement of the evidence tends to show that there was a claim of misrepresentation of the contents of the instrument, and also that the plaintiff was not in a condition to fully understand what he was doing. The defendant moved the court to instruct the jury that the release was a complete bar to the action. This was denied and the question of fraud was submitted to the jury. No tender of return of the consideration was made at any time, but the jury were permitted to deduct it from the amount allowed plaintiff for his damages. The question of tender was not expressly, but impliedly, passed on in approving the charge to the jury.

(4) It is unnecessary to review the evidence offered by the plaintiff in support of the charge of fraud in obtaining her signature to the release, all of which appears in the statement of the case heretofore made. In our opinion it was sufficient to

require the submission of the issue to the jury. Whether the witnesses were credible, and whether their evidence had been overcome by the contradictory evidence of the defendant, were questions for the exclusive determination of the jury.

The evidence, regarded in the aspect most favorable to the plaintiff, tended to show that at the time of touching the pen she was in bed suffering considerable pain, and that she was weak, nervous, and weeping under the strain. If, however, the validity of the release turned solely upon her incapacity to understand what it was represented to be, namely, a release of her right of action, this evidence, standing alone, would not be sufficient; but it was entitled to weight in determining whether she signed the release under the false impression that its execution by her husband made it operative to destroy any right of action she may have had. If in her weakened and nervous condition she was induced to sign under that belief, produced by the declaration of her husband in the presence of defendant's agent, who neither contradicted nor explained it, her action cannot be governed by the general rule that applies in the case of a mistake of law, and it is unnecessary to consider the distinction between ignorance of a general rule of law and ignorance of law relating to a mere private right of property. A misrepresentation of the law, especially under such circumstances, does not differ in effect from the misrepresentation of a material fact.

(5) The fact that plaintiff used the money and cashed the check shortly after their receipt did not show a ratification of the release, as matter of law. If when this was done plaintiff remained under the same impression that she had when she signed, or authorized her signature to be attached to, the release, then there was no ratification. "One cannot waive or acquiesce in a wrong while ignorant that it has been committed." *Pence* v. *Langdon,* 99 U. S. 578, 581, 25 L. ed. 420, 421.

3. One other question remains to be considered, as it may arise on the new trial if not now determined. A champertous contract that may have been made by plaintiff with some third

person for the maintenance of the action is no bar to her recovery.    *Burnes* v. *Scott,* 117 U. S. 582, 589, 29 L. ed. 991, 993, 6 Sup. Ct. Rep. 865.   Evidence, therefore, tending to show that the plaintiff had not furnished the deposit for costs, or the money tendered to defendant to repay that received at the time of the execution of the release, was irrelevant, and ought not to have been admitted over her objection.

For the errors pointed out the judgment must be reversed, with costs, and the cause remanded, with direction to vacate the verdict and grant a new trial.   It is so ordered.   *Reversed.*