# GILDENHORN *v.* COLUMBIA REAL ESTATE TITLE INSURANCE COMPANY

[No. 193, September Term, 1973.]

*Decided April 3, 1974.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*A. Slater Clarke* for appellant.

*Michael A. Schuchat* for appellee.

SMITH, J., delivered the opinion of the Court.

William Gildenhorn (Gildenhorn) sued Columbia Real Estate Title Insurance Company (Columbia) and District-Realty Title Insurance Corporation (District) in a

five count declaration.[1] Count 1 was against the appellee, Columbia, for alleged breach of contract relative to its title policies 7883, issued July 28, 1966, and 7884, issued March 1, 1966.[2] Count 2 was a claim for punitive damages against Columbia for this alleged breach of contract. Count 3 was against District for its alleged breach of contract on a title policy issued by it. Count 4 was a claim against District for punitive damages for its alleged breach. Count 5 was against Columbia and District for conspiracy, about which we shall have more to say later.

Within the time limited by rule, Columbia filed a special plea of limitations, followed by a motion for summary judgment. The trial judge ruled in favor of Columbia on all three counts against it, counts 1, 2, and 5. Pursuant to Maryland Rule 605 a, he made a finding that there was no just reason for delay and directed entry of a final judgment in favor of Columbia against Gildenhorn.

The first question with which we are here presented is whether the trial judge erred in concluding that, under a five year claim provision in the insurance policies, counts 1 and 2 were not seasonably filed. A subsidiary question to that is whether these policies are specialties. The second question is whether count 5, the conspiracy count, was timely filed.

I

Suit was filed on September 13, 1972. The title policies pertained to deeds of trust on real estate owned by Rollin Hills Apartments, Inc., securing loans made by Gildenhorn. The trial judge summarized the pertinent facts relative to the first two counts of the declaration:

> "Gildenhorn alleges that Columbia breached its obligation to defend him against certain 'title

1. Before the conclusion of this case in the circuit court a suggestion of the death of Gildenhorn on March 11, 1973, was filed together with a motion to substitute Herbert J. Gildenhorn and A. Slater Clarke, personal representatives of his estate, as parties plaintiff. Maryland Rule 220 c 1 provides that such a motion "shall be granted as of right." No action appears to have been taken on the motion and the order for appeal was filed in the name of Gildenhorn.

2. We are provided with no information as to why the lower numbered policy was issued almost five months after the higher numbered policy.

challenges' covered by the policies. The 'title challenge' involved was a suit brought by Rollin's Trustee in Bankruptcy during February, 1967, in the U. S. District Court, seeking an injunction to prevent Gildenhorn from proceeding further to foreclose on the Rollin's properties in the Prince George's County Circuit Court. On March 13, 1967, the Trustee obtained the injunction against plaintiff's foreclosure suits. Thereafter counsel for plaintiff sent a written notice to defendant, dated March 23, 1967, requesting Columbia 'to take whatever steps are necessary for the protection of Mr. Gildenhorn in accordance with your policies.' This notice was restated in writing by Gildenhorn's counsel to Columbia on June 26, 1967, but defendant did not act or defend as requested in both communications."

The two title policies issued by Columbia had the following testimonium clause:

"IN WITNESS WHEREOF, Columbia Real Estate Title Insurance Company has caused its corporate name and seal to be hereunto affixed by its duly authorized officers."

Below that was printed the name of the corporation with facsimile signatures of the president and secretary below that. The corporate seal was printed over those signatures. To the left was a provision for countersignature. The policies had been countersigned by a representative of Maryland Title & Escrow Corporation.

Paragraph 5 of the conditions and stipulations of the two policies stated:

"*Notice of Loss — Limitation of Action.* In addition to the notices required under paragraph 4 (b), a statement in writing of any loss or damage for which it is claimed the Company is liable under this policy shall be furnished to the Company within sixty days after such loss or damage shall

have been determined, and no right of action shall accrue to the Insured under this policy until thirty days after such statement shall have been furnished, and no recovery shall be had by the Insured under this policy unless action shall be commenced thereon within five years after expiration of said thirty-day period. Failure to furnish such statement of loss or damage, or to commence such action within the time hereinbefore specified, shall be a conclusive bar against maintenance by the Insured of any action under this policy."

Gildenhorn reasons that Maryland Code (1957), Art. 57, § 3, provides a 12 year statute of limitations as to a specialty, that the policies in question are specialties, and that, because of the provisions of Code (1957, 1972 Repl. Vol.) Art. 48A, § 377B, the five year limitation provision in each policy is inapplicable. Section 377B states:

"All provisions and stipulations contained in any contract of insurance . . . , whatsoever, heretofore or hereafter issued, fixing the time in which suits or actions may be instituted under or upon any such contracts at a period of time less than that provided at the time of the issuance or delivery of any such contract by the laws or statutes of Maryland in respect of limitations are hereby declared to be against State public policy, illegal and void, and no court in this State shall give any effect to any provisions or stipulation in any such contract mentioned in this section; nor shall any defense to liability under any such contract be based upon any such shorter limitation period."

That section was enacted by Chapter 487 of the Acts of 1966, effective June 1, 1966. In the view we take of this case, we are not obliged to determine whether that section could be applicable to policy 7884, issued March 1, 1966. *See*, however, *Ghingher v. Pearson*, 165 Md. 273, 281-84, 168 A. 105 (1933).

Citing *Leonardi v. Standard Acc. Ins. Co. of Detroit*,

*Mich.*, 212 F. 2d 887 (2d Cir. 1954), 18 G. Couch, *Insurance* § 75:80 (2d ed. Anderson 1968) states relative to applicability of contractual limitations:

> "An action by an insured to recover damages for breach of a contractual obligation to defend was not an action on the policy to recover upon any claim or for any loss under an insuring clause and thus was not barred by the contractual limitation of 2 years." *Id.* at 760.

In the latter case, Judge Medina said for the court:

> "The present action was not commenced until July 17, 1950, some four years after the entry of the judgment in favor of Gulf Oil against Leonardi. Standard contends that recovery by Leonardi of the amount paid in settlement of the judgment is barred by Condition G of the Workmen's Compensation and Employers' Liability policy, which provides as follows:
>
>> 'No action shall lie against the company to recover upon any claim or for any loss under paragraph One (b) foregoing unless brought after the amount of such claim or loss shall have been fixed and rendered certain either by final judgment against this employer after trial of the issue or by agreement between the parties with the written consent of the company, nor in any event unless brought within two years thereafter.'
>
> "But this action is brought by the insured to recover damages rising from the insurer's breach of its contractual obligation to defend contained in paragraph Two (b), and is not an action on the policy 'to recover upon any claim or for any loss under paragraph One (b)' of the policy, against which the insurer expressly agreed to indemnify the insured. In Lawrence v. Massachusetts Bonding & Insurance Co., Sup., 1916, 160 N.Y.S. 883, 885,

where this specific question was considered, Judge Irving Lehman wrote:

'In determining the rights of the parties in this action it seems to me that the most important consideration is that the action is not brought to enforce the agreement to indemnify the plaintiff for loss and expenses, but is brought for damages for failure to defend an action.* * * The limitation in the policy is, I think, by its plain terms intended to cover an action for such loss and expenses, and is not intended to cover an action for damages caused by the breach of the covenant to defend. Inasmuch as the limitation applies only to actions brought to recover any loss or expense "under this policy," against which the defendant expressly agreed to indemnify the plaintiff, while this action is brought to recover damages for breach of contract to defend, the present action is subject only to the limitation of the statute, and not to any limitation provided in the contract. * * * The contract never contemplated that the defendant would breach its contract, and it contains no provisions for an action for such breach of contract. Such an action, consequently, is governed by the ordinary rules of law governing actions for breach of contract.'

"We agree with this conclusion and the reasoning on which it is based." *Id.* at 890-91.

To similar effect, *see* 45 C.J.S. *Insurance* § 933 (1946) stating relative to the effect of failure or refusal to defend:

"Insurer's breach of contract by refusal to defend puts an end to its right to demand insureu s compliance with the terms of the contract . . . ." *Id.* at 1059.

Cases cited for that proposition include *U.S.F. & G. v. Nat.*

*Pav. Co.*, 228 Md. 40, 178 A. 2d 872 (1962); *St. Louis Dressed Beef & P. Co. v. Maryland Casualty Co.*, 201 U. S. 173, 26 S. Ct. 400, 50 L. Ed. 712 (1906); and *Missionaries of Co. of Mary, Inc. v. Aetna Cas. & S. Co.*, 155 Conn. 104, 230 A. 2d 21 (1967), among others.

In *U.S.F. & G. v. Nat. Pav. Co.*, *supra,* the company relied upon a provision relative to coverage which said that it would pay on behalf of the insured sums which the insured should "become legally obligated to pay as damages because of bodily injury," and condition nine in the policy which provided that no action should lie against the company unless as a condition precedent thereto the insured had fully complied with the terms of the policy and there should be no action unless the amount of the insured's obligation to pay had been finally determined either by judgment against the insured after trial or by written agreement of the insured, the claimant and the company. There was no judicial determination of liability and the company had not agreed to a settlement. Judge Sybert there said for the Court:

> "As pointed out in our recital of the facts, the insurance company was notified of the proposed settlement negotiations but declined by its silence to participate. If it can be shown that the claim and potential liability faced by National was within the coverage of the schedule liability policy and if it is clear that National acted in good faith and with due care and prudence in settling the suit which U.S.F. & G. had an obligation to defend (which are two basic questions answered hereinafter), then appellant's contention is without force.

> "It is settled law that where there is a denial of liability and a refusal to defend on the part of the insurer under the conditions described above, the insured is no longer bound by a provision of a policy prohibiting settlement of claims without the insurer's consent, or a provision making the insurer's liability dependent on the obtaining of a judgment against the insured. The insured under

such circumstances may make a reasonable compromise of the suit without losing his right to recover from the insurer under the policy. The majority of jurisdictions have so held, the cases being collected in an annotation, 49 A.L.R.2d 694, 744 et seq. [Citing cases and authorities.] Such refusal to defend by the insurer has been held to constitute a waiver of similar restrictive provisions against the insured. [Citing cases and authorities.]

"As we shall now proceed to point out, we feel that the claim of Keitz against National did come within the terms of the schedule liability policy; that U.S.F. & G. therefore had a duty to defend; that when it refused and National proceeded with reasonable prudence to settle the claim after notifying U.S.F. & G., the latter could no longer rely on provisions in the contract precluding a settlement without its consent or requiring a judgment against the insured." *Id.* at 48-49.

In *St. Louis Dressed Beef & P. Co. v. Maryland Casualty Co., supra,* an insurance company had failed to defend on the ground that its policy did not cover the accident or the claims. The insured sued to recover the sum it paid in compromise of the claims. Mr. Justice Holmes said for the Court:

"But there is another aspect of the eighth condition of the slip which requires a few words more. It is said that this condition expressly contemplates a breach of contract by the company, and defines the plaintiff's rights in that case. The words 'no action shall lie against the company as respects any loss under this policy unless,' etc., certainly do contemplate a case in court in which the company may turn out to be in the wrong, and therefore technically guilty of a breach of contract. But notwithstanding the contrary suggestion in *Sanders v. Frankfort Marine, Accident & Plate Glass Ins. Co.,* 72 N.H. 485, 498, 499, we think that

the only breach which that condition has in view is a refusal by the company to pay after the decision in a case of which it has taken charge, when, notwithstanding the judgment, it conceives itself to have a defense. The action referred to is an action for money alleged to be due under the policy. *Contracts rarely provide in detail for their nonperformance.* It would be stretching the words quoted to a significance equally hurtful to both parties, and probably equally absent from the minds of both, to read them as having within their scope an initial repudiation of liability by the defendant and a requirement that in that event the plaintiff should be bound to try the case against itself, although it should be plain that by a compromise it could reduce its claim on the defendant as well as its own loss." *Id.* at 182-83. (Emphasis added.)

In *Missionaries of Co. of Mary, Inc. v. Aetna Cas. & S. Co., supra,* an owners', landlords', and tenants' liability insurance policy had been issued. A negligence action was brought against the plaintiff by a person who was injured when he fell into an open ditch. The insurance company was requested to defend. It refused to do so, contending the injury sustained was not covered under the policy. The court said:

"The defendant having, in effect, waived the opportunity which was open to it to perform its contractual duty to defend under a reservation of its right to contest the obligation to indemnify the plaintiff, reason dictates that the defendant should reimburse the plaintiff for the full amount of the obligation reasonably incurred by it. *Arenson v. National Automobile & Casualty Ins. Co.,* 48 Cal.2d 528, 539, 310 P.2d 961. The defendant, after breaking the contract by its unqualified refusal to defend, should not thereafter be permitted to seek the protection of that

contract in avoidance of its indemnity provisions."
*Id.* at 113-14.

We conclude that since this was a suit for the breach of Columbia's contract to defend, not a suit to recover for loss sustained as a result of "any defect in the execution of the mortgage described in [the title policy] . . . or charge of said mortgage upon the estate referred to in [that] policy; or the invalidity or unenforceability of the lien of the mortgage upon said estate; or the title to the said estate . . . ; or the unmarketability of the title of the mortgagor; or any defect in or lien or encumbrance on said title . . . ," the five year provision in the title policy is not applicable. Accordingly, we pass to the question of whether the policies were specialties, since if they were specialities, a twelve year statute of limitations is applicable.

Code (1957) Art. 57, § 3, in force when this case was decided, provides in pertinent part:

"No bill . . . or other specialty whatsoever . . . shall be good and pleadable, or admitted in evidence . . . in this State after . . . the debt or thing in action is above twelve years' standing . . . ."

Judge Chesnut pointed out in *General Petroleum Corp. v. Seaboard Terminals Corp.*, 19 F. Supp. 882 (D. Md. 1937):

"This statute of limitations does not itseli define what constitutes a specialty, nor is there any other Maryland statute so far as I am aware which does. It is a well-known term of the common law which in Maryland and elsewhere by judicial decision denotes a legal instrument under seal." *Id.* at 883-84.

*See, e.g.*, W. Brantly, *Contracts* § 50 (2d ed. rev. 1922), and *Mattare v. Cunningham*, 148 Md. 309, 314-15, 129 A. 654 (1925). The point was precisely recognized in the recodification embodied in Code, Courts and Judicial

Proceedings Article § 5-102 a, which became effective January 1, 1974.

In the early law it was held that a corporation could not contract except under its corporate seal. This rule persisted, but was increasingly relaxed during the 19th century. Today, in the absence of charter or statute to the contrary, a corporation may bind itself by a writing not under seal to the same extent as an individual. As a result, the main purpose of the corporate seal now is as a *prima facie* authentication that the document is the act of the corporation and that the officers who have executed it have been thereunto duly authorized. This function of the corporate seal, however, must be distinguished from its use as a general seal. 2 S. Williston, *Contracts* § 271A (3d ed. Jaeger 1959) (citing *General Petroleum Corp. v. Seaboard Terminals Corp., supra*); and 6 W. Fletcher, *Cyclopedia of the Law of Private Corporations* §§ 2466 and 2471 (rev. vol. Wolf 1968). The mere fact that the corporate seal appears on the instrument other than in the usual place of the private seal would not make the instrument a specialty in the absence of a recital affixing the seal or of extrinsic evidence showing an intention to have it serve the function of a general seal. In other words, it is a question of fact in any specific case as to whether the corporation has employed its corporate seal as a general seal or whether it has adopted any other permissible form of seal as convenient for the particular purpose. Williston, *op. cit.* § 271A (citing *General Petroleum Corp. v. Seaboard Terminals Corp.*, 23 F. Supp. 137 (D. Md. 1938)).

*Jackson v. Myers*, 43 Md. 452 (1876), was relied upon by the trial judge and is relied upon here by Columbia. There the question was whether a note sued upon was to be treated as a negotiable promissory note, making the endorser liable, or as a specialty. It contained the printed corporate seal of the corporate maker. The note had been executed by the duly appointed officers of the corporation. There was no statement or declaration in any part of the note that it was intended to be or was in fact executed under the corporate seal. The corporate seal printed by the printer at the time

the blank note was printed was the only thing that was supposed to have deprived the instrument of the quality of a promissory note. Judge Alvey there said for the Court:

"Whether this printed symbol is a sufficient seal, or can be made sufficient by adoption, is a question that we need not now decide; for, even conceding it to be a sufficient representation of the corporate seal, still, we are of opinion that the note in question is a negotiable promissory note, by the endorsement of which in the ordinary manner liability attached to the endorser." *Id.* at 464.

The Court found from extrinsic evidence that there were a number of indicia that a negotiable promissory note was intended and that the printed representation of the corporate seal, even if conceded to be sufficient as a seal, was not printed on the note to restrain its negotiability.

The Court again considered the point in *Muth v. Dolfield*, 43 Md. 466 (1876), with Judge Alvey again writing for the Court. A similar conclusion, relying upon *Jackson*, was reached, with its being noted:

"[T]here is nothing on the face of the notes to indicate in the slightest manner that this type or emblem of the seal was intended to authenticate the notes, or to be any part of their execution. They are in form negotiable promissory notes, signed by the officers of the corporation, and it is conceded that they, and others of similar form and character, to a very large amount, have been used and regarded by the commercial community as negotiable notes, subject to all the rules and usages that apply to that class of commercial paper. And such being the general understanding in regard to them, it is but fair to presume that the makers designed them to be so used and regarded." *Id.* at 470.

To like effect *see Hamburger v. Miller*, 48 Md. 317, 323 (1878), also written by Judge Alvey.

In *Smith v. Woman's Medical College,* 110 Md. 441, 72 A. 1107 (1909), referred to by Judge Singley for the Court in *Henry's Drive-In v. Pappas,* 264 Md. 422, 431, 287 A. 2d 35 (1972), the question as to whether a corporate seal on a note with no reference to it was a specialty was again before the Court. Relative to the instrument the Court said:

> "It will be observed that while the corporate seal of the defendant corporation. is affixed at the bottom of the paper, no reference is made to the seal in the body of the instrument, nor is there anything on the face of the paper to indicate that it was intended to be a bond or specialty." *Id.* at 444.

> \* \* \*

> "As no reference is made in the body of the instrument sued on in this case to the corporate seal impressed thereon, and as there is nothing on the face of the paper to indicate that it was intended to be issued as a specialty, we think that unquestionably, under the previous decisions of this Court, as well as upon the authority of the text-writers quoted above, the instrument must be considered a simple contract obligation, and not a specialty." *Id.* at 445-46.

It must be borne in mind that the Court there was dealing with a question of pleading only. It had before it for consideration merely the face of the contract sued upon which showed a non-negotiable promissory note of the corporation signed by the president and by the plaintiff (the payee) as secretary, with the impression of the corporate seal under the latter's signature.

*Conowingo Land Co. v. McGaw,* 124 Md. 643, 93 A. 222 (1915), more closely approximates the situation here. McGaw sued the corporation on three certificates of indebtedness which stated in part:

> "Witness the signature of the Treasurer, together with the seal of said corporation, annexed hereto, duly attested by its Secretary."

The certificate was executed in accordance with that testimonium and the seal was affixed. The corporation contended "that the papers sued on were not writings obligatory — not to be treated as specialties — and hence the limitation of three years was applicable." Chief Judge Boyd there said for the Court:

> "It is true that it does not necessarily follow that because the seal of a corporation is attached to a note it is a specialty, but the cases cited by the appellant support, rather than refute the theory that these certificates are instruments under seal. In *Jackson v. Myers*, 43 Md. 452; *Muth v. Dolfield*, 43 Md. 466, and *Smith v. Woman's Medical College*, 110 Md. 441, in determining whether the instruments sued on were specialties, the Court emphasized the fact that there was nothing on the face of either of them to indicate that the seal was intended to be affixed. In *Smith v. Woman's College* it is said: 'As no reference is made in the body of the instrument sued on in this case to the corporate seal impressed thereon, and as there is nothing on the face of the paper to indicate that it was intended to be issued as a specialty, we think that unquestionably, under the previous decisions of this Court, as well as upon the authority of the text writers quoted above, the instrument must be considered a simple contract obligation, and not a specialty.'"

> ". . . If the corporation intended to execute specialties, it would have adopted the language used, or something equivalent to it, and in the absence of anything on the face of the certificates showing a contrary intention, we are of the opinion that these instruments are specialties." *Id.* at 646-47.

The effect of the Maryland cases was summarized by Judge Chesnut in *General Petroleum Corp. v. Seaboard Terminals Corp.*, 23 F. Supp. 137 (D. Md. 1938):

"In my opinion the effect of the Maryland decisions so far as applicable to the instant case, goes only to the extent of holding that the mere presence of a corporate seal on a paper, without reference to the seal in the paper, is not sufficient of itself to show that the instrument is necessarily a sealed instrument; and I do not think that the cases are to be taken as ruling, contrary to the general law, that extrinsic evidence is inadmissible to show that the seal was impressed with the intention of making the corporation's contract a specialty." *Id.* at 141.

In 7 W. Fletcher, *op. cit.*, § 3021 (rev. vol. Wolf 1964) it is stated relative to execution of instruments by corporations:

"Instruments formerly required to be under seal . . . , where a corporation is a party thereto, should designate the corporation by its proper name as a party to the instrument, and it is customary and good form, after stating the corporate name, to add 'a corporation organized and existing under and by virtue of the laws of the state of,' naming the state where the company was incorporated. . . . [T]he usual concluding clause, where the corporation is the grantor, is some such form as 'In witness whereof, the said _____ company has hereunto caused this instrument to be executed in its name, on its behalf and under its corporate seal, by its president and secretary, this _____ _____ day of _____, 19____' The name of the corporation should then be subscribed underneath, and the better form is for it to precede the names of the officers signing for the corporation, which should follow the name of the corporation, by some such word as 'Per' or 'By,' and of course the title of the office should follow the name. . . .

"It has been said that greater precision of form is required in case of sealed instruments than in case of simple and mercantile contracts." *Id.* at 89-91.

Similar comment is found in 1A A. Corbin, *Contracts* § 242 (1963). We note that 2 H. Wood, *Limitation of Actions* § 176a(2) (4th ed. Moore 1916) likewise states:

"A recital in an unsealed instrument that it is under seal makes the instrument a sealed one for the purpose of the statute of limitations. The mere attaching of a seal after the signature does not raise the presumption that a note is a sealed instrument, unless there be a recognition of the seal in the body of the instrument by some such phrase as 'Witness my hand and seal' or 'Signed and sealed; ' and, in the absence of such circumstances, the seal is regarded merely as surplusage, and the character of the note is not changed." *Id.* at 824-25.

The question that inevitably arises in this case is in what manner would Columbia have executed its title policy if it did intend the policy to be regarded as a specialty? Surely, it would have used the exact language that was used, or, as Chief Judge Boyd put it in *Conowingo*, "something equivalent to it." Had it intended the contract not to be a specialty, it might well have been less formal in its language and execution, possibly omitting, as in *Jackson*, a reference to the seal. We find *Conowingo* persuasive authority.

We see no significance in the fact that the corporate seal here was printed rather than impressed. In *Jacksonville, M., P. Ry. and Nav. Co. v. Hooper*, 160 U. S. 514, 16 S. Ct. 379, 40 L. Ed. 515 (1896), the question presented was whether "[seal]" next to the company name was the seal of the corporation or the seal of the president of the corporation who signed the contract. Mr. Justice Shiras there said for the Court:

"But, in the absence of evidence to the contrary, the scroll or rectangle containing the word 'seal' will be deemed to be the proper and common seal of the company. A seal is not necessarily of any particular form or figure.

"In *Pillow v. Roberts*, 13 How. 472, 474, this court

said, through Mr. Justice Grier, when discussing an objection that an instrument read was improperly admitted in evidence because the seal of the Circuit Court authenticating the acknowledgment was an impression stamped on paper and not 'on wax, wafer, or any other adhesive or tenacious substance,' said: 'It is the seal which authenticates, and not the substance on which it is impressed; and where the court can recognize its identity, they should not be called upon to analyze the material which exhibits it. . . . ' " *Id.* at 518.

Citing *Jacksonville,* 18 Am. Jur. 2d *Corporations* § 154 (1965) states:

> "Indeed, it has been said that a corporate seal may consist of anything found upon a paper and which appears to have been put there by due authority or to have been adopted and used by such authority as and for the seal of the corporation." *Id.* at 689.

In *Phillips v. Insley,* 113 Md. 341, 77 A. 850 (1910), our predecessors were concerned with the validity of a conveyance of land previously owned by a Methodist church in Cambridge. The church had been incorporated. The Court noted that "[u]nder the Maryland system of incorporating religious societies the trustees and not the congregation constitute the corporation." The conveyance had been executed by the trustees of the church stating that they were "acting in their corporate capacity as 'an ecclesiastical corporation created under the laws of Maryland.' " Judge Schmucker there said for our predecessors:

> "The word '(seal)' appears on the record affixed to each signature. It of course does not appear whether on the original deed the seals were wax impressions or mere scrolls, but assuming them to have been scrolls we think the deed was a valid corporate conveyance. In *Mill Dam Foundry v. Hovey,* 21 Pick. 417, where the signature of each of the corporation officials to a deed had affixed to

it a piece of blank paper attached by a wafer, without any impression on any of them indicative of a corporate seal, the instrument was held to be the deed of the corporation the Court saying in its opinion 'a corporation as well as an individual may adopt any seal. They need not say that it is their common seal. This law is as old as the hills.' See to like effect *St. Phillips Church v. Lion's Church*, 23 S. C. 297; *Taylor v. Haggie*, 83 N. C. 244; *Ransom v. Stonington Savings Bank*, 13 N. J. Eq. 212; *Ill. Cent. R. R. Co. v. Johnson*, 40 Ill. 35; *Wiley v. Board of Education*, 11 Minn. 370; 7 *A. & E. Encyl.* 692; 10 *Cyc.* 1011-12." *Id.* at 348.

In *McNulty v. Medical Service of District of Columbia*, 176 A. 2d 783 (D.C. Mun. App. 1962), the court had a situation in which the testimonium clause recited seals and the word "seal" apparently appeared after the name of an individual party to the contract, but the seal of the corporate party was not affixed. In the process of holding the instrument to be a specialty, the court said:

"It has long been the general rule that it is not necessary that there be as many seals as signatures to an instrument. Mindell v. Goldman, 309 Mass. 472, 35 N.E.2d 669; 79 C.J.S. Seals § 4. And it has also been the rule that one party may adopt the seal of another as his own; indeed, when one party signs an instrument to which another has affixed his seal, there is a presumption that he has adopted that seal. Rockwell v. Capital Traction Co., 25 App. D.C. 98. And a corporation may adopt as a seal anything which is capable of being adopted by a natural person, even though it has a special seal which it ordinarily uses. 1 Williston, Contracts § 208 (3rd ed.); and see cases cited below.

"Some years ago a similar situation was before the Second Circuit Court of Appeals. The contract did not bear the seal of a defendant: but it did bear the seal of plaintiff and recited that it was under

seal. Judge Augustus Hand wrote that in such cases 'the party whose seal is not attached is to be regarded as having adopted the seal which has been affixed, and therefore as making the contract one under seal.' C.F. Starita Co. v. Compagnie Havraise Peninsulaire, etc., 2d Cir., 52 F.2d 58, 62. The same rule has been applied in other decisions. Brick v. Cohn-Hall-Marx Co., 283 N.Y. 99, 27 N.E.2d 518; Zeiss v. Wurster, 139 Misc. 538, 247 N.Y.S. 811; Dreyer v. Shapiro-Bernstein & Co., 73 N.Y.S.2d 56, aff'd 273 App. Div. 760, 75 N.Y.S.2d 536; Wilson v. Munday, 238 Ill. App. 575. See also Restatement, Contracts §§ 98(2), 99; 47 Am.Jur., Seals § 5." *Id.* at 784.

We conclude that the insurance policies were specialties and, therefore, subject to the 12 year statute of limitations. It follows, therefore, that the trial judge erred in granting summary judgment against Gildenhorn in favor of Columbia on counts 1 and 2.

## II

The fifth count of Gildenhorn's declaration incorporated the allegations of the first four counts. It then stated that "both of the said defendants conspired together from 1966 to date for the purpose and intent to damage, defraud, hinder and delay [Gildenhorn] from foreclosing under his [three] deeds of trust secured on properties described in each insurance policy [mentioned in the previous counts] issued by [Columbia and District] when each note secured thereby became delinquent." He claimed that in furtherance of that conspiracy they "refuse[d] to honor the terms of their insurance contracts when called upon to defend challenges to the validity and title of the deeds of trust of [Gildenhorn]," that Columbia and District "did cause litigation to be instituted challenging the validity of [Gildenhorn's] deed of trust note in which litigation . . . District . . . in furtherance of the conspiracy permitted one of its officers to appear as attorney for the plaintiff and that said actions of [Columbia and District] damaged and delayed the plaintiff in

foreclosing on said properties for a substantial period of time," resulting in loss to Gildenhorn.

One begins to get a glimmer of what is behind all this litigation when it is noted that in *Gen. Inv. Funds v. Gildenhorn,* 260 Md. 170, 271 A. 2d 650 (1970), we had before us a challenge by a junior lienholder to the validity of the deed of trust insured by District. It is claimed in the briefs here that Columbia instituted that litigation, which litigation is listed in Gildenhorn's bill of particulars as one of the challenges to his title, a challenge also mentioned in his answers to interrogatories to which we shall later allude. We there held Gildenhorn's lien to be valid.[3]

The foreclosure sales covered by the two policies issued by Columbia were ratified on December 9 and December 18, 1968, according to an affidavit by Columbia's attorney submitted as a part of the motion for summary judgment.

Interrogatories were submitted by Columbia to Gildenhorn. The seventh interrogatory said:

> "7. With respect to Count 5 state what specific actions plaintiff contends defendant Columbia took pursuant to the alleged conspiracy. Give the dates, names of persons involved and exact action taken."

Gildenhorn's answer was:

> "7. That the defendant Columbia refused to defend or provide a defense to the Plaintiff herein pursuant to the two contracts herein before described and then actively undertook to represent the General Tire and Investment Corporation in regards to challenging the title of the Plaintiff herein on property referred to as Cipriano Road and in that regard, arranged to defend General Tire and to retain as its attorney for these purposes, one Thomas S. Jackson who this defendant knew or should have known was an officer of the

---

**3.** We were advised by Columbia's counsel at oral argument that Columbia had insured the lien of General Investment Funds Real Estate Holding Company, the junior lienholder.

Corporation which had insured the title of the Plaintiff, Gildenhorn on the Cipriano property. This action was done during the year 1967; the persons involved would have been Jasper Moore, James Proctor, trustees and John Mitchell and Mr. Kane of Columbia Title Insurance Company. Additional facts concerning the actions of Columbia will be developed as result of discovery that the Plaintiff will seek to take and therefore, this answer will be supplemented."

The answer was not later supplemented. It will be seen that in that answer Columbia has said that the action concerning which complaint was made relative to "caus[ing] litigation to be instituted" was done in 1967.

We cannot dispose of this case by pointing out that suit was instituted on September 13, 1972, more than three years after the final ratification of sale of the two parcels insured by Columbia and more than four years after the last possible date for the conspiracy relative to the litigation as specified by Columbia in its answer, saying that the three year period of limitations under Code (1957) Art. 57, § 1 precludes recovery, as suggested by Columbia, because a vital question remains unanswered. Rule 610 d 1 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." In this case we are provided with no information relative to the third deed of trust involved in the declaration, that insured by District and challenged in *Gen. Inv. Funds v. Gildenhorn, supra.* The declaration states that the two alleged conspirators "damage[d], defraud[ed], hinder[ed] and delay[ed] [Gildenhorn] from foreclosing under his various deeds of trust" and that the "defendants conspired together from 1966 to date." If that deed of trust has been foreclosed, the record does not disclose when it was foreclosed.[4] We note

---

4. We were advised at oral argument that foreclosure was held and the sale "was ratified . . . in April of '71."

that the final decree filed on April 22, 1970, which was before us in *Gen. Inv. Funds,* at that time "authorized and permitted [the trustees] to proceed with foreclosure of said deed of trust . . . ." Accordingly, we are not able to determine from the facts at hand that the right of action on the conspiracy count accrued more than three years prior to September 13, 1972. Thus, the motion for summary judgment should have been denied.

> *Judgment reversed and case remanded for trial; appellee to pay costs.*