WALTER M. WRIGHT ET AL. *v.* HENRY R. LEWIS ET AL., TRUSTEES IN BANKRUPTCY.

[Nos. 63, 64, October Term, 1931.]

676

*Decided February 3rd, 1932.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, and SLOAN, JJ.

*T. Alan Goldsborough* and *F. Leonard Wailes,* with whom were *Fred R. Owens, Oscar Clarke,* and *Wailes & Robins,* on the briefs, for the appellants.

*John S. Whaley,* with whom were *Staton, Whaley & Price* on the briefs, for the appellees.

Bond, C. J., delivered the opinion of the Court.

The trustees in bankruptcy of the Eastern Shore Brokerage & Commission Company, a corporation, now, after answers were filed to their bill of complaint which was upheld in the case of *Wright v. Lewis,* 149 Md. 71, 130 A. 911, and after testimony was taken, have obtained a decree compelling the appellants, as subscribers to the stock of the corporation, to pay unpaid portions of the par value of the stock. And the principal question is whether the appellants did become subscribers to the extent of the amounts unpaid. They were all found listed on the records of the corporation as subscribers in the amounts contended for, and correspondence and other documentary evidence found in the corporation's possession showed payments by them of calls for percentages of the amounts listed, and references by them to their subscriptions, all without any dispute of the correctness of the total amounts for which, on the corporation's books, they appeared to have subscribed, but the method followed in procuring subscriptions is shown to have been informal in some respects, and understandings and expectations are urged as rendering the subscriptions incomplete, and there are questions of conditions attached to subscriptions and not performed on behalf of the corporation.

The corporation was formed under the General Incorporation Law of Maryland in March of 1919, and began business about a month later. Its purpose, as stated in the articles of incorporation, included specifically, among others, those of carrying on a general commission and brokerage business, and buying and selling, importing, exporting, trading and dealing in, canned, dried and preserved fruits and vegetables and all other food products. It appears from the evidence, however, that the primary purpose in the minds of the promoters and subscribers was that of carrying on the brokerage and commission business, selling the products of canners of fruits and vegetables. And it was contemplated that subscribers to the stock should be procured chiefly from among persons interested in the canning industry, most of whom would sell their products through the corporation. But there was no restric-

tion of the business to that of brokerage and commission transactions until April 19th, 1920, when at a meeting of stockholders it was formally resolved that the company should not buy any canned goods or other products for its own account, for profit or otherwise, except as might be deemed necessary by the executive committee to avoid loss. Up to that time the company had dealt in canned goods for its own account, and had sustained losses from which it never recovered.

It is questioned, first, whether it has been sufficiently shown that the corporation became insolvent, so that recourse against the subscribers to the stock was justified. Code, art. 23, sec. 77. But on this we have met with no difficulty. We find from the testimony that the trustees made all due efforts to collect the assets, and that they were able to collect only $463.09 in all, and the claims filed against the bankrupt estate aggregate $28,260.39.

Whether the defendants did subscribe to the shares with which they are charged on the corporation records is, first of all, a question of completion of a contract to take so many shares. The total authorized capital stock was $100,000 in 1,000 shares of $100 each. There were no written signed subscriptions, but none were necessary to constitute complete subscriptions. *Cantor v. Baltimore Overall Co.*, 121 Md. 65, 87 A. 1115; *Musgrave v. Morrison*, 54 Md. 161, 165; 2 *Fletcher, Corporations*, 1181, 1189. A list of probable subscribers was made up by the promoters of the enterprise, proportioned somewhat to the amount of business that each might be expected to have with the corporation, and the officers, or others who had already subscribed, solicited subscriptions of those not yet included. From the list so made up a stock journal was opened, and the payments were entered as made. It was generally assumed that there would be a demand for all the stock which the company might need to have subscribed, and that, if any person approached for a subscription should decline to take the number of shares allotted to him, all that he rejected could easily be placed among other persons. No one was to be permitted to take more than

stock to the par value of $5,000. In all, stock to the par value of $68,000 was put out, and appears on the stock journal as subscribed to. The promoters did not anticipate a need for more than half of the amount of money represented by so many shares, and to expressions of hesitation by some of those approached for subscriptions assurances of some kind seem to have been given. Many of the defendants testified that they were given options or privileges, but they differ as to the terms of the options or privileges, some saying that they were to make only partial payments on fixed numbers of shares, and some that they were to take no fixed numbers finally, at the time of subscribing, but were to decide later how many they would take, up to the limit of the numbers -stated on the list of subscriptions. None objected to the listing of their names for the numbers of shares stated, and none later failed to accept the allotted numbers as the proper basis of payments of percentages called for. On the contrary, all of them, with a few exceptions, definitely and clearly calculated their liabilities on the basis of the number of shares allotted, many referring to their subscriptions as for so many shares. The few who did not accept the number as listed have been held in the decree only for the number for which they did pay, if any. So far as the records of the corporation and the letters in its file show, all of the defendants agreed with the facts as now found by the lower court.

There are thirty defendants and appellants, counting partnerships as single subscribers, and twenty of them were present and taking part at a meeting of stockholders on May 26th, 1919, when it was voted that "the stock be issued in full for the amount subscribed to each subscriber and ten per cent. be paid in cash and the remainder be paid for by non-interest bearing notes on demand and stock held on collateral to said notes, said notes to be subject to call as to part payments whenever needed by the company." And these and the remaining ten subscribers alike responded to the calls on the basis of the listed amounts. It is not clear from the testimony how far the plan of taking notes for unpaid portions was followed; seven subscribers testify to having received

680

certificates for shares to the value of the amounts paid in, half the whole par value of the allotted shares, and a little more in two instances. In the months of April to August of 1919, calls were issued for a total of fifty per cent. of the par value of the shares listed on the books as subscribed, the first three calls for ten per cent. each, and one or two calls—the number is left uncertain—for the remaining twenty per cent. In each call, letters to the stockholders demanded the given percentage of the listed amounts of subscriptions, and in many instances the subscribers themselves described their payments as the called percentages of their subscriptions. Payments were acknowledged by the corporation officers as constituting the given percentages. Some of the subscribers, indeed, have not denied the correctness of the listed subscriptions, except upon the ground that there were defeating conditions. In all this documentary evidence in the possession of the trustees, then, the defendants, whatever may have been the reservations or conditions they had in mind, appear assuming the positions of subscribers to the number of shares listed, as definitely as if they had done so in previous signed subscriptions. This court concurs with the conclusion of the lower court that their declarations had the same effect in law as if they had been contained in such previous subscriptions. And this fact renders them liable for unpaid portions of the subscription prices, notwithstanding any arrangements that they might in the end take reduced numbers of shares or pay less than the total par values, unless there should be defeating conditions as contended for, because such arrangements for reduction of shares or payments would not be valid as against creditors. *Crawford v. Rohrer*, 59 Md. 599, 604; *Rider v. Morrison*, 54 Md. 429. "The rule is established by many authorities that an oral or secret agreement by which the subscriber is to be relieved, or by which he is to receive his money back or by which he is not to pay anything, or only a part of his subscription, is invalid and not sufficient to release a subscriber either in whole or in part as against creditors. * * * It may be said that any secret agreement or arrangement by which the subscriber is not to pay, or is not to be

called upon, or that he is to pay when he is so disposed, or that the corporation will take the stock back, or that his money will be repaid on a contract, is void and will not have the effect to release him." 1 *Thompson, Corporations,* sec. 874.

One appellant J. Richard Phillips, Jr., has made the additional separate defense that, after he had paid all the calls made upon the shares allotted to him, and before the bankruptcy and demand for further payment, he had transferred his stock, and a new certificate for the shares had been issued to his transferee. But it appears that he had originally been allotted fifty shares, and that he had paid the amounts called for on the fifty shares, and had transferred only twenty-five, and the decree against him was for the amount unpaid on the remaining twenty-five shares; therefore, no complaint against the decree results from the fact of his transfer.

Reliance is placed upon the presumption recognized in several earlier decisions of this court, that the number of shares of stock authorized in the charter of a business corporation has been intended and fixed as the number which the corporation needs to have subscribed before entering upon the enterprise, that earlier subscriptions are taken to be held in abeyance until all shares have been subscribed for, and earlier subscribers are therefore not liable to make payments to meet debts incurred in business done previously. *Hager v. Cleveland,* 36 Md. 476, 491; *Stillman v. Dougherty,* 44 Md. 380, 384; *Morrison v. Dorsey,* 48 Md. 461; *Musgrave. v. Morrison,* 54 Md. 161; *Morgan v. Landstreet,* 109 Md. 558, 72 A. 399; *Tyler v. Receivers,* 160 Md. 333, 152 A. 896. This is a presumption of intention, one of fact, and may, as pointed out in the cases cited, be contradicted as any other presumption of fact may be; or, regarding it as erecting a condition to the liability for payments, the condition may be waived or dispensed with, as any right may ordinarily be waived, or violation of it legally acquiesced in. "This waiver may be either express or implied from the acts and declarations of the subscribers. If knowing the whole capital stock has not been taken, they attend the meetings of

the company, co-operate in the votes for the expenditure of money—for the purchase of property—for the making of contracts, and other acts which could only be properly done upon the assumption that the subscribers intended to proceed with the stock partially taken up, they would be estopped from setting up such a defence." *Hager v. Cleveland, supra.* "The defence thus relied on, was intended to protect subscribers who in good faith objected to the organization of a company when its capital stock which was necessary to the enterprise, had not in fact been taken, but it was never intended and Courts will never permit it to be used as an instrument of fraud." *Morrison v. Dorsey, supra,* page 473 of 48 Md.; *Musgrave v. Morrison, supra.* In the present case, the defense is inconsistent with that made on behalf of many of the defendants that they were privileged to take finally only part of the shares allotted to them, for nearly all of them were aware that the company was doing business while, as they contend, such part of the stock as they might not accept was not taken; and except for a few subscribers, it appears that all did actively participate as stockholders or directors, or both, in the business affairs of the corporation, when they knew that not all the stock had been taken even provisionally. None of the defendants ever before suit disclaimed the obligation on his subscription, asked for the return of the amounts he had paid in, or otherwise made any move to rescind. The answers given to the few questions asked on this defense seem rather to indicate that none of the subscribers had any thought of possible connection between the time of commencing business and the number of shares subscribed for. The twenty defendants who were present at the meeting of the stockholders on May 26th, 1919, before the second, third and fourth calls had been made, and so before forty per cent. of the amounts allotted had been paid for, voted that the second call be made, and that the directors use their best judgment as to the sale of the remaining stock, and at the same time received the report of the sales manager on spot and future sales made since May 5th. With respect to these twenty defendants, no other expressions of intention

or waiver need be recited, because from this alone it appears clearly that they acquiesced in the doing of business before all the stock authorized was subscribed for. Of the remaining ten subscribers, five, Messrs. Jackson, T. F. Noble, Phillips, S. O. Neal, representing W. H. Neal & Sons Co., and Harper, representing the partnership of Messick & Harper, are shown by the evidence to have been aware that the corporation was transacting business before all the stock was taken up, and before they had paid all the calls which they did pay. Mr. Phillips was a director and from the beginning, or near the beginning, participated in the efforts to do business and to obtain subscribers. Mr. Neal and Mr. Harper appear to have been active at stockholders' meetings from April 19th, 1920, and at a meeting on that date heard read the minutes of the stockholders' meeting of May 26th, 1919, and those of directors' meetings held since, at which were presented detailed statements of the actual conditions of subscriptions and of the business done. Messrs. Jackson and Noble were doing business with the corporation when their own subscriptions were being solicited or paid. And Messrs. A. V. Neal and S. O. Neal say they knew, when they were asked to subscribe, that the company had been engaged in business. Mr. S. O. Neal, moreover, assisted in the original opening of the company's books and knew its plans. Four more of the subscribers who were not present at any meetings, Messrs. Handy, Harry Nuttle, Spedden, and the members of the partnership of Riggin & Brother, testified that they did business with the corporation, but were not asked when it was that they did this business. Three of them, Messrs. Handy, Spedden, and Riggin, and a fourth, Mr. Todd, were among those who, according to their contentions, expected that they might later turn back to the company some of the stock allotted to them and on which they paid calls. As no definite time was fixed for the exercise of their options or privileges to reject part of their allotments, it follows that they expected the business to be prosecuted while some of the stock might yet be unsubscribed, unless it could be presumed that they expected the starting of the business to be likewise put off

indefinitely, which would be a strained presumption. It would, in addition, be an expectation or presumption which the fact of the early issuance of the calls would not permit, for calls for funds in any considerable amounts for this enterprise would obviously be only for the purpose of prosecuting the business. There would be no preparatory outlay, no investment in plant or equipment, except in the negligible amounts required for office equipment and supplies. We conclude, therefore, that the defense upon a presumption that all stock was expected to be taken up before business was started was not, as to these subscribers, consistent with the facts in evidence. This leaves the defense on this ground of only one subscriber, Harry Nuttle, to be considered, and, from only very meager testimony taken with respect to his understandings and expectations, we think it could not be found that a presumption that the business would be deferred until after all stock should be taken up was overcome. He himself did business with the company, but when is not stated, and he received and paid the calls for funds for the business, but there is no testimony to show that he may have had knowledge of the fact that some stock of the corporation might be unsubscribed when business was started. He does not contend for an option or privilege to reject some of the stock allotted; his impression was, he testified, merely that the subscribers would never have to pay in full for the stock subscribed; and that impression shows no expectation that all or some of the shares authorized might be unsubscribed at any given time. For lack of evidence to rebut this defense on the part of Mr. Harry Nuttle, therefore, we are in disagreement with so much of the decree as holds him liable.

The failure of subscribers to rescind their subscriptions when they learned of the company's having done business without having had all its stock subscribed, and to demand repayment of amounts paid by them on the calls, seems to this court insufficient to support a finding of waiver or acquiescence. The inference would not arise fairly from the mere fact of inaction of the subscribers, who had only their

own interests to consider. It might be inferred equally well that they abandoned the amounts paid in as not recoverable.

Another defense advanced on behalf of several subscribers is that they were assured that the corporation would not engage in any of the lines of business authorized in its articles of incorporation except that of brokerage and dealing on commission. There was no binding contract or condition to this effect, and it is settled that such a collateral understanding, even if it might be regarded as having imposed a condition on the subscriptions to stock, would not be effective against creditors of the corporation. *Cantor v. Baltimore Overall Co.,* 121 Md. 65, 87 A. 1115.

That no further call by the corporation was required in order to fix liability for the unpaid parts of the subscriptions on behalf of creditors was settled in the cases of *Crawford v. Rohrer,* 59 Md. 599, and *Goldstein v. Leitch.* 142 Md. 184, 187, 120 A. 369.

The decree will be affirmed as to all of the defendants and appellants except Harry Nuttle, and as to him will be reversed.

> *Decree affirmed as to all appellants except Harry Nuttle, with costs to the appellees, and as to Harry Nuttle reversed, with costs to that appellant.*