GERALD S. KLEIN, RECEIVER ETC. v.
FREDERICK K. WEISS ET AL.

[No. 163, September Term, 1977.]

*Decided November 20, 1978.*

38

*Gerald S. Klein,* with whom was *Thomas E. Webb* on the brief, for appellant.

*Raymond S. Smethurst, Jr.,* with whom were *Sally D. Adkins* and *Adkins, Potts & Smethurst* on the brief, for appellee Harry Hammond and Chris J. Christ. *Risque W. Plummer* for appellee Frederick K. Weiss. *Brian E. Barkley* for appellee Constantine A. Anthony.

MURPHY, C. J., delivered the opinion of the Court.

This case involves an ill-fated business venture in Ocean City, Maryland, known as the Seventy-Sixth Street Limited Partnership (the Limited Partnership), which the parties

intended to form pursuant to the provisions of the Maryland Uniform Limited Partnership Act (the Uniform Act), Maryland Code (1975) §§ 10-101 through 10-129 of the Corporations and Associations Article. The central issue in the appeal is whether the receiver of the Limited Partnership, appointed on behalf of creditors, may enforce agreements executed by the limited partners for capital contributions to the Limited Partnership.

The Uniform Act provides for the formation of a limited partnership, consisting of one or more general partners and one or more limited partners, the latter not being bound by the obligations of the partnership. § 10-101. Persons desiring to form a limited partnership under the Act's provisions must, as a statutory prerequisite to formation, execute a certificate of limited partnership and record it with the clerk of the appropriate circuit court; the certificate must set forth a number of details of the partnership, including the identity of the partners, and the capital contributions to be made by each limited partner. § 10-102. Section 10-115 of the Act governs the withdrawal of the capital contributions made by limited partners; it generally provides that such contributions may not be returned until the liabilities of the partnership have been satisfied. Section 10-116 provides that a limited partner's liability, as set forth in the certificate of partnership, cannot be waived or compromised to adversely affect the right of a creditor of the partnership who extended credit to it after the certificate was filed, and before it was canceled or amended, to enforce his claims against the partnership.

The Limited Partnership evolved from these facts: John Fulton, an Ocean City real estate broker, and Victoria Rinaldi, his associate, devised a plan to commercially develop a tract of bayfront land located in Ocean City, which was then owned by the Seventy-Sixth Street Joint Venture (the Joint Venture). On October 10, 1972, Fulton and Rinaldi contracted to purchase the property from the Joint Venture for $450,000. The contract was signed by Fulton and Rinaldi as general partners of the Seventy-Sixth Street Limited Partnership, although no such partnership was then in existence. Under

the terms of the contract, $10,000 was paid at the time the contract was signed; settlement was to take place on March 15, 1973, at which time $175,000 was to be paid in cash, and the Limited Partnership was to assume an existing mortgage not to exceed $124,000, and execute a purchase money mortgage to the Joint Venture in the amount of $141,000.

To raise the money needed to purchase the property, Fulton and Rinaldi decided to create a limited partnership pursuant to which they would act as general partners, and sell 25 limited partnership units for $9,000 each, thereby generating $225,000. Of this amount, $185,000 would be used to pay the cash obligation under the contract. The balance would service the mortgages during the first year and pay settlement and other costs.

Lloyd Whitehead, of the law firm of Perdue, Owrutsky & Whitehead, was employed by Fulton to prepare the legal papers and documents necessary to effectuate the plan. In late January or early February of 1973, Whitehead drafted an instruction letter, a subscription agreement, a limited partnership agreement and a certificate of limited partnership, all to be used in the solicitation of prospective limited partners.

As originally drafted by Whitehead, the partnership agreement and the partnership certificate required that each limited partner make an initial capital contribution of $9,000 for each partnership unit purchased; it also called for a future contribution of $15,298 per unit, representing the per unit share of the mortgage debt to be created on the property to be acquired from the Joint Venture. This future contribution was to be paid in accordance with a mortgage payment schedule which was attached to the partnership agreement and listed the annual per unit payment, based on 25 contributing shares, for the years 1973 through 1981. The agreement specified that the dates on which these payments were due would be provided to the limited partners by the general partners or the escrow agent, Perdue, Owrutsky & Whitehead, not later than 90 days before the first such payment was required.

The proposed partnership agreement acknowledged that

there was a pre-existing business arrangement between the limited and general partners. It stated that the limited partners ratified the contract made by Fulton and Rinaldi in October of 1972 to purchase the Joint Venture property. It provided that a maximum of 25 limited partnership units would be sold and that no limited partner had the right to withdraw his capital contributions unless there was sufficient cash or other property to operate the partnership or upon dissolution.

Under the proposed partnership agreement, the general partners were authorized to take title to the Joint Venture property and to execute any documents on behalf of the partnership which related thereto, whether before or after the filing of the partnership certificate, as to which the limited partners "hereby ratify and confirm any such action by the General Partners." The agreement also provided that the limited partners consented to any mortgage by the general partners of the partnership's assets "on such terms and conditions as may be determined by the General Partners, and to any contract, agreement ... or arrangement with ... [others] as the General Partners may deem necessary to accomplish the purposes of this Partnership...." The general partners were empowered, in their absolute discretion, "to borrow money and as security therefor to mortgage or subject to other security device any part of the property of the Partnership; to ... refinance, recast, increase, modify ... or extend any such property ... upon such terms as they deem proper ... [and] to execute, acknowledge and deliver any and all instruments to effectuate the foregoing." The agreement designated the general partners as attorney and agent for the limited partners to execute and record on their behalf "all certificates or other instruments ... which the General Partner deems appropriate to qualify or continue the Partnership as a Limited Partnership ... [and] all instruments which the General Partner deems appropriate to effect a change or modification of the Partnership in accordance with the terms of this Agreement...."

The proposed partnership agreement and certificate set forth the names and addresses of Fulton and Rinaldi as

general partners. With respect to the identity of the limited partners, the partnership documents stated: "See attached Instruments of Execution." The certificate made no mention of the number of limited partnership units to be sold.

The instruction letter which Whitehead had prepared for the information of prospective limited partners set forth the steps to be taken by persons interested in investing in the venture. The letter directed prospective subscribers to execute the subscription agreement; that agreement specified that the subscriber had received and read the limited partnership agreement and the limited partnership certificate prior to executing the subscription agreement. The instruction letter directed prospective limited partners to sign "instruments of execution," which were therewith provided, these being separate documents to be separately appended to the partnership agreement and certificate; they disclosed the identity of the limited partners, and recited their acceptance and adoption of all the provisions contained in the partnership agreement and certificate. Finally, the instruction letter directed subscribers to send all the subscription documents to the Limited Partnership, together with a check in the amount of the initial capital contribution.

It was provided in the subscription agreement that at the time the Limited Partnership settled on the Joint Venture property, Fulton and Rinaldi, individually, would enter into a contract with the Limited Partnership to repurchase the property within one year thereafter, paying an amount therefor which would yield to the limited partners net proceeds of $100,000 in excess of their initial capital contribution. Thus, the subscription agreement led each subscriber to expect within a year a substantial return on his original $9,000 investment without ever being called upon to make any part of the additional $15,298 contribution specified in the partnership agreement and certificate.

Of the maximum 25 limited partnership units for sale, only 7 units were sold, including the 3¹/₂ units purchased by the appellees in this case. The initial capital contribution of $9,000 for each subscribed partnership unit was duly paid to the Limited Partnership.

The appellee Hammond had been solicited by Whitehead in February of 1973 and purchased a unit as a tenant in common with another individual. Hammond signed the "instruments of execution" on March 1, 1973 and paid $4,500, representing his one-half share of the initial capital contribution. He claimed that he never read the agreement or certificate of limited partnership.

The appellee Weiss had been solicited by a real estate salesman employed by Fulton. He purchased a full share and signed the "instruments of execution" on February 7, 1973. He saw a copy of the partnership agreement and certificate and expected that the "instruments of execution" which he signed would be attached to these documents.

The appellee Anthony had been told of the opportunity to invest in the Limited Partnership by John Nason, one of Whitehead's law partners. He subscribed to one partnership unit in his own name and a second unit as a tenant in common with the appellee Christ. Anthony signed the "instruments of execution" for the share which he individually purchased on March 12, 1973. As to the unit owned in common with Christ, both men signed the documents on March 15, 1973.

Because the Limited Partnership sold only 7 partnership units, Fulton and Rinaldi were unable to raise the money necessary to settle for the Joint Venture property on March 15, 1973, as previously agreed. Fulton obtained an extension of the settlement date by one week to March 22, 1973. In the interim, he arranged, on behalf of the Limited Partnership, a two-year, $309,000 loan, from Commercial Credit Development Corporation (Commercial Credit). The loan was to be secured by a first mortgage on the land, with interest to float 5% over the prime interest rate. The Joint Venture agreed to accept a second mortgage on the property for $141,000.

The loan from Commercial Credit substantially increased the mortgage debt of the Limited Partnership over that projected in the original partnership agreement and certificate, necessitating the making of changes in these documents to reflect the increased liability to the limited partners. Fulton told Whitehead to make the necessary

changes and said that he would contact the limited partners, notify them of the changes, and obtain their consent.

The original partnership agreement and partnership certificate, which called for an additional contribution of $15,298, were revised by Whitehead on March 21 or 22, 1973. The revised documents reflected that each limited partnership unit was liable, over and above the $9,000 per unit initial capital contribution, for 4% of the total mortgage debt — an amount substantially greater than the $15,298 specified in the original documents. The schedule of mortgage payments which had been appended to the original partnership agreement, and which was structured to service the mortgage debt incurred under the original plan for financing the acquisition of the Joint Venture property, was removed from the revised document. The "instruments of execution" previously signed by each of the subscribing limited partners, which were to be appended to the original partnership documents, were attached to the revised partnership agreement and certificate. Based on these revised documents, Fulton and Rinaldi went to settlement on March 22, 1973.

Whitehead was present at the settlement with Fulton and Rinaldi; Commercial Credit and the Joint Venture were each represented by counsel. Fulton and Rinaldi signed the partnership agreement and certificate at settlement. According to Whitehead, neither counsel for Commercial Credit nor the Joint Venture examined the partnership documents; he acknowledged, however, that "it was necessary to have the Certificate at the time of settlement," which included the instruments of execution signed by the limited partners. Counsel for the Joint Venture was uncertain whether he inspected the partnership documents; he said that it was "likely" that he checked the papers and knew that the general and limited partners "were good." He said that as security for the second mortgage, he relied "on the fact that there were certain signers on the Limited Partnership." Whitehead did not tell counsel for Commercial Credit or the Joint Venture that the original partnership documents had been revised. The Limited Partnership executed the required

mortgages in favor of the Joint Venture and Commercial Credit. Fulton and Rinaldi, in their individual capacities, contracted with the Limited Partnership to repurchase the property within one year, as had been previously agreed. Immediately after the settlement was concluded, the partnership certificate was recorded with the clerk of the court; counsel for Commercial Credit obtained a copy of the recorded certificate at that time.

Shortly after the settlement was concluded, Whitehead learned that the limited partners had not been notified by Fulton of the changes made to the partnership documents. He therefore prepared a document entitled "Notice to Limited Partners of Right to Rescind Limited Partnership Subscription of Seventy-Sixth Street Limited Partnership and of Right to Receive Refund of Limited Partnership Capital." The document related that the partnership agreement and certificate had been revised. It outlined the details of the newly substituted method of financing the purchase of the property. It stated that the property had a total indebtedness against it of $450,000, and that this resulted in an increase of each limited partner's potential risk from $15,298 to $22,425 (the latter figure being based on certain assumptions regarding the prime interest rate). The document was sent to each limited partner, and required an election to rescind or not to rescind his subscription.

Anthony elected not to rescind the share which he individually owned. Anthony and Christ elected to rescind the share held in common and they received a return of their $9,000 initial capital contribution. Hammond elected to rescind as to his one-half share and $4,500 was returned to him. Weiss never received the document and therefore made no election.

Neither the partnership agreement nor the certificate was amended to reflect these changes in the capital structure of the Limited Partnership and none of its creditors was notified.

Fulton and Rinaldi did not perform their contract to purchase the property from the Limited Partnership, and after approximately one year it defaulted on the mortgages. Commercial Credit foreclosed its first mortgage and obtained

a deficiency decree for $100,372. The Joint Venture recovered nothing on its second mortgage claim of $202,476.

Gerald Klein was subsequently appointed as receiver for the Limited Partnership and vested with authority to take possession of partnership property, collect its debts, and recover all capital contributions receivable from the limited partners. Commercial Credit and the Joint Venture filed their claims with the receiver. The receiver sued the limited partners on behalf of the creditors for 4% of the mortgage debt for each unit owned, and for recovery of the initial capital contributions which had been returned to appellees Hammond, Anthony and Christ. The cause of action was based upon the revised partnership documents, which were appended as exhibits to the declaration. The receiver claimed that Weiss was liable for $23,428, representing a 4% share of the mortgage debt; that Anthony was liable, as to his separate unit, for the same amount; that Christ and Anthony, as to their joint unit, were liable for $23,428, plus $9,000 representing the initial capital contribution refunded to them; and that Hammond was liable for $23,428, less $3,500 received from his cotenant who settled with the receiver, plus $4,500 in the returned initial capital contribution.[1]

At the trial before the Circuit Court for Worcester County, the appellees adduced evidence through Whitehead of the alteration of the original partnership agreement and certificate and of the substitution and use of the revised partnership documents in their place. The receiver subsequently moved to exclude this evidence on the ground that the appellees had not, in answering his interrogatories and requests for admissions of fact, revealed the existence of the original partnership documents — a fact of which the receiver had no prior knowledge. The trial court (Everngam, J.) overruled the motion, and after considering all the evidence received at the trial, held that the limited partners were not liable to the receiver for any of the amounts claimed. The court said that the appellees agreed to become limited

---

1. The other limited partners, comprising the remaining $3^{1}/_{2}$ partnership units, settled the receiver's claims against them for a total of $26,500. Three of the settling limited partners were law partners of Whitehead.

partners only on the basis of the partnership agreement and certificate originally prepared by Whitehead. It said that these documents were predicated on the sale of all 25 limited partnership units, with a total mortgage liability of only $265,000; and that absent full subscription no partnership was formed. The court held, alternatively, that the later revision in the partnership documents made by Whitehead without the knowledge or consent of the limited partners changed the entire financial structure of the partnership; that because the alterations were material, the partnership "never came into being" and, as to the appellees, the partnership agreement and certificate were void. The court said:

> "Under the first original Agreement, the entire mortgage debt of $265,000 was to be shared by 25 limited partners, or 4%. The risk was that one or more of the limited partners might not be able to pay his share. Cushioning that risk was the $185,000 equity of the partnership in the land.

> "Under the altered Agreement, there was no equity of the partnership in the land, since it cost $450,000 and the two mortgages therein totaled $450,000. Although the limited partner's obligation remained only 4%, it was of a substantially larger mortgage debt ($450,000 vs. $265,000) and his risk was increased by the fact that there were only seven and not twenty-five limited partners to share that burden. The difference would have to be picked up by the two general partners whose financial position was such that they had to originate this method of financing the whole deal. The result in banker's and realtor's language is that the greater risk lacked the 'equity cushion' because the entire purchase price had been 'financed out'.

> "It is axiomatic that any (unauthorized and unknown) change in a legal instrument substantially increasing the amount of money to be paid thereunder or increasing the risk incurred is a material alteration that renders the instrument void. [citations omitted]

"It follows that where a cause of action is based on an altered instrument so as to destroy its efficacy to such an extent that no rights can be asserted or proved by it, then it cannot be the gravamen of the suit.

"In addition we believe that alteration of the partnership agreement and certificate without the consent and knowledge of the limited partners constituted a fraud upon them. [citations omitted]

* * *

"The later partnership agreement and certificate were materially altered in substance, if not in form. To those were unauthorizedly appended the Instruments of Execution that had been signed to be a part of a different and potentially less hazardous investment.

"Those partnership documents used at settlement and for the execution of the two mortgages and recorded with the Clerk of the Circuit Court for Worcester County, had been approved and executed by the two general partners without authority or knowledge of the intended limited partnership. In this Court's view it was the same as if they had clipped the names of those signing a legal document and pasted them on a spurious substitute. It was an improper and illegal thing to be done."

The receiver appealed from the trial court's judgment exonerating the limited partners of all liability for any of the amounts claimed. We granted certiorari prior to decision by the Court of Special Appeals to consider the important issues raised by the appeal.

The receiver presents these principal questions:

"1. Whether the trial court erred in admitting evidence of the alteration of the Certificate of Limited Partnership when the fact of such alteration had been withheld by Appellees in their response to

Interrogatories and Requests for Admissions of Fact;

2. Whether the Receiver of a Limited Partnership, suing on behalf of creditors to enforce capital contribution obligations and to regain capital refunded to Limited Partners, is barred from recovery by the failure of full subscription to Limited Partnership Units when no requirement of full subscription conditioned the capital contribution obligations;

3. Whether a Receiver of a Limited Partnership, suing on behalf of creditors to enforce capital contribution obligations and to regain capital refunded to Limited Partners, is barred from recovery by the failure of the Limited Partnership to make the calls for capital contribution contemplated by the terms of its Certificate;

4. Whether a Receiver of a Limited Partnership, suing on behalf of creditors to enforce capital contribution obligations and to regain capital refunded to Limited Partners, is barred from recovery by the alteration of the Certificate of Limited Partnership by the Partnership's General Partners and attorney;

5. Whether a Receiver of a Limited Partnership, suing on behalf of creditors to regain capital contributions refunded to Limited Partners, is barred from recovery by Limitations when proceedings to enforce such claim were instituted within three years of the Receiver's discovery of the refund but beyond three years from its occurrence."

## (A)

Limited partnerships were unknown at common law; they are exclusively a creature of statute, their main purpose being to permit a form of business enterprise, other than a corporation, in which persons could invest money without becoming liable as general partners for all debts of the

partnership. 2 R. Rowley, *Rowley on Partnership* § 53.0 (2d ed. 1960); 60 Am. Jur. 2d *Partnership* § 371 (1972). "The general purpose of [limited partnership] acts was not to assist creditors, but was to enable persons to invest their money in partnerships and share in the profits without being liable for more than the amount of money they had contributed. The reason for this was to encourage investing." *Gilman Paint & Varnish Co. v. Legum,* 197 Md. 665, 670, 80 A. 2d 906 (1951).

The first limited partnership statute in the United States was enacted by New York in 1822; Maryland adopted a similar statute by ch. 97 of the Acts of 1836. These early statutes required the recording of a partnership certificate giving notice to the public of the exact terms of the partnership, including the amount of the capital contributions of the limited partners, so that the public could deal with the partnership "advisedly." *Lineweaver v. Slagle,* 64 Md. 465, 2 A. 693 (1886). The fundamental difference between the liability of general and limited partners under these statutes was "that the former are responsible *in solido* for the debts and obligations of the firm, as in the case of ordinary partnerships, without regard to the amounts contributed by them to the social capital; whilst the latter is not personally liable if the statute has been complied with, because his cash contribution is substituted for a personal liability." *Safe Deposit Co. v. Cahn,* 102 Md. 530, 546, 62 A. 819 (1906). Strict compliance with all statutory provisions was deemed essential to create a limited partnership under these early statutes, since they were in derogation of the common law. As a consequence, even minor or trivial infractions of the statute were held by some courts to subject the limited partners to unlimited liability as general partners. Rowley, *supra,* at § 53.0; A. Bromberg, *Crane and Bromberg on Partnership* §§ 26, 32 (1968). Because the strict construction of these statutes inhibited the effective accomplishment of the purpose for which they were intended, the National Conference of Commissioners on Uniform State Laws proposed the adoption in 1916 of a Uniform Limited Partnership Act. Maryland enacted the Uniform Act by ch. 280 of the Acts of 1918, and the statute with minor

modifications is now in effect in every state in the country except Louisiana. The Act's provisions are intended to govern the determination of essentially all questions arising out of the formation and operation of limited partnerships. The rule that statutes in derogation of the common law are to be strictly construed is expressly made inapplicable to the Uniform Act.

Decisions interpreting the Uniform Act recognize that a limited partnership consists of general partners who conduct the business and who have unlimited liability to creditors for its obligations, and of limited partners who have no right to participate in the management of the business, and whose liability is limited to the amount of their capital contribution. *See, e.g., McCully v. Radack,* 27 Md. App. 350, 340 A. 2d 374 (1975); *Garbo v. Hilleary Franchise Systems, Inc.,* 479 S.W.2d 491 (Mo. App. 1972); *Freedman v. Tax Review Bd. of City of Philadelphia,* 212 Pa. Super. 442, 243 A. 2d 130 (1968); *Riviera Congress Associates v. Yassky,* 268 N.Y.S.2d 854, 25 A.D.2d 291, *aff'd,* 18 N.Y.2d 540, 277 N.Y.S.2d 386, 223 N.E.2d 876 (1966); *Hoefer v. Hall,* 75 N. M. 751, 411 P. 2d 230 (1965); *Vulcan Furniture Manufacturing Corp. v. Vaughn,* 168 So. 2d 760 (Fla. App. 1964); *Ruzicka v. Rager,* 305 N. Y. 191, 111 N.E.2d 878 (1953); *Lanier v. Bowdoin,* 282 N. Y. 32, 24 N.E.2d 732 (1939). As the Official Comment to § 1 of the Uniform Act makes clear, a limited partner, though so called by custom, is not "in any sense" either a partner or a principal in the business or transactions of the partnership; his liability, except for known false statements in the certificate of partnership, is to the partnership, and not to its creditors. *See* 6 Uniform Laws Annotated, *Uniform Limited Partnership Act* § 1 (Master ed. 1969). Succinctly put, a limited partnership interest in a business is in the nature of an investment. *In re Panitz & Co.,* 270 F. Supp. 448 (D. Md. 1967), *aff'd sub nom. Hammerman v. Arlington Fed. Sav. & Loan Ass'n,* 385 F. 2d 835 (4th Cir. 1967). Section 10-116 (a) of the Uniform Act delineates the extent of the limited partner's investment in the business; it makes him liable to the partnership:

"(1) For the difference between his contribution as

actually made and that stated in the certificate as having been made; and

(2) For any unpaid contribution which he agreed in the certificate to make in the future at the time and on the conditions stated in the certificate."

The creation of a limited partnership is not a mere private, informal, voluntary agreement as in the case of a general partnership, but is a public and formal proceeding which must follow the statutory requirements of the Uniform Act. 2 J. Barrett and E. Seago, *Partners and Partnerships, Law and Taxation,* ch. 13, § 2.1 (1956); 2 Z. Cavitch, *Business Organizations* § 39.01 (3) (1977); *Crane and Bromberg on Partnership* § 26. The Act prescribes, § 10-102 (b) of the Corporations Article, that a limited partnership is formed "if there has been substantial compliance in good faith" with the requirements contained in § 10-102 (a). That subsection mandates that a certificate of partnership be signed by the parties, acknowledged, and recorded with the clerk of the court. It requires that the certificate set forth 14 designated partnership details, including the name of the partnership, the character and location of the business, the identity of the general and limited partners, the term of the partnership, the cash contributions made by the limited partners, and such additional contributions, if any, which the limited partners have agreed to make in the future. The certificate is a statutory prerequisite to creation of a limited partnership and until it is filed, the partnership is not formed as a limited partnership. The principal function of the certificate is to give third persons notice of the essential features of the limited partnership. Of course, whether a limited partnership has been formed is of particular importance in determining whether a person has achieved the status of a limited partner with the attendant limitation of his liability to third persons dealing with the partnership. See *Hoefer v. Hall,* 75 N. M. 751, 411 P. 2d 230 (1965); *Holvey v. Stewart,* 265 Or. 242, 509 P. 2d 17 (1973); *Frigidaire Sales Corp. v. Union Properties, Inc.,* 88 Wash. 2d 400, 562 P. 2d 244 (1977); *Brown v. Brown,* 15 Ariz. App. 333, 488 P. 2d 689 (1971); Rowley, *supra,* § 53.2; *Business Organizations, supra,* at § 39.05.

(B)

(1)

The receiver contends that the trial court abused its discretion in admitting evidence of the alteration of the partnership agreement and certificate when the fact of such alteration had been withheld by the appellees in their responses to pretrial interrogatories and requests for admissions of fact. He claims that the failure of the appellees to reveal this information was highly prejudicial and compromised his ability to counter what became the appellees' principal defense — that the partnership agreement and certificate attached to the receiver's declaration as an exhibit were not the original documents upon which they agreed to be bound.

The receiver's discovery efforts were well calculated to flush out the existence of all pertinent documents pertaining to the obligations of the limited partners. It is equally clear that the appellees' pretrial responses to the receiver's attempted discovery efforts did not provide the requisite information. While the appellees' explanation for their failure to disclose the information until trial is tenuous at best — being based essentially on a claim of ignorance of its existence — we nevertheless conclude that the trial judge did not, in the circumstances of this case, abuse his discretion in admitting the contested evidence.

Whitehead testified for the appellees that he prepared a first draft of the agreement and certificate in January or February of 1973, and a second draft on March 21 or 22, 1973. He was asked to explain the structural basis of the limited partnership as reflected in these documents. The receiver objected on the specific ground that the limited partnership certificate was a plain, unambiguous and integrated document, and that any explanation which varied the terms of the recorded certificate was irrelevant and inadmissible; the objection was overruled. Whitehead explained that under the first draft the future contribution of each limited partner was $15,298, but that a subsequent modification of the method of financing necessitated changes in the additional

obligation of each subscriber; hence, the second draft documents were prepared. The receiver thereafter objected to testimony by Whitehead concerning Fulton's contract to purchase the property from the Limited Partnership, again on grounds of relevancy. Shortly thereafter, when the appellees sought to introduce the original version of the certificate and agreement into evidence, the receiver objected "on the grounds that we have been stating."

It was not until the next day that the receiver made a motion to strike the original partnership documents and Whitehead's testimony concerning them that the discovery issue was first raised. At that time, the receiver contended that this evidence should not be admitted because the appellees had not revealed the existence of the original set of documents.

Since all of the receiver's objections were specifically based on relevancy grounds, he is thereby limited in his claim of error on appeal and ordinarily is deemed to have waived other grounds not mentioned. *von Lusch v. State,* 279 Md. 255, 368 A. 2d 468 (1977). Maryland Rule 522 d 2. The receiver's objection on the ground that the appellees did not make adequate disclosures during the discovery process should have been made at the time the evidence was offered, and not in a subsequent motion to strike. It appears that the trial judge, in denying the receiver's motion, concluded that it had not been timely entered.

One of the fundamental and principal objectives of the discovery rules is to require disclosure of facts by a party litigant to all of his adversaries, and thereby to eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, concerning the facts that give rise to the litigation. *Balto. Transit v. Mezzanotti,* 227 Md. 8, 174 A. 2d 768 (1961). Of course, interrogatories are continuing in nature and there is ordinarily an obligation continuing to the time of trial to communicate any new information in the possession of the party examined; indeed, to permit a party to sit idly by, knowing that a previous answer he has given to an interrogatory is not truthful in the light of his present

information, is intolerable. *Pare v. Rodrique,* 256 Md. 204, 260 A. 2d 313 (1969). Although failure of a party to give his opponent the added information may be ground for refusing to allow the introduction of relevant evidence, the trial judge is vested with a large measure of discretion in applying sanctions for failure to adhere to the discovery rules. *Broadwater v. Arch,* 267 Md. 329, 297 A. 2d 671 (1972); *Mason v. Wolfing,* 265 Md. 234, 288 A. 2d 880 (1972); *Evans v. Howard,* 256 Md. 155, 259 A. 2d 528 (1969). There is no contention that the appellees' failure to disclose the information was wilful or contumacious; there is, therefore, no mandatory requirement that the evidence be excluded. *Smith v. Potomac Electric,* 236 Md. 51, 202 A. 2d 604 (1964). The receiver could have requested a continuance if he believed that he had been prejudiced, but he did not. That the original partnership documents, and the testimony relating thereto, were permitted in evidence did not constitute such an abuse of discretion in this case as would warrant reversal of the judgment. In any event, since we shall remand the case for other reasons, the receiver ultimately will suffer no prejudice from the admission of the original documents in evidence.

### (2)

The receiver contends that the lower court erred in concluding that a condition precedent to any obligation on the part of the appellees to pay their capital contributions under the partnership documents was the sale of all 25 limited partnership units. He argues that failure of full subscription to the partnership units sought to be sold did not release those who did subscribe since there was no contractual commitment to full subscription and no appropriate reservation in either the original or the revised partnership documents. We agree.

The partnership agreement defines a "Limited Partnership Unit" in terms of the required initial and additional capital contributions, and provides that "The capital of the Partnership shall consist of a maximum of two (2) General Partnership Units and twenty-five (25) Limited Partnership

Units." While Fulton and Rinaldi may have contemplated the sale of all 25 units, and indeed needed the proceeds from these sales to finance the acquisition as originally planned, nothing in the partnership documents — the agreement or the certificate — calls for the sale of all 25 units as a contractual precondition to the formation of the Limited Partnership.

The partnership agreement makes reference to limited partners "additional" to those executing the agreement; it also provides that the partnership would begin on the date the agreement was executed. The clear import of these provisions is that the Limited Partnership would commence, and the obligation to make the initial capital contributions would become effective, on the date of the agreement, even though all 25 units had not been sold at that time. It is true that the mortgage payment schedule originally attached to the agreement calculated future contributions of the limited partners on the basis of the sale of 25 units; however, the schedule did not condition the capital obligation on the sale of all units.

Neither the original nor the revised partnership certificate contained any condition that all units had to be sold before the limited partners would become obligated to pay their capital contributions. Indeed, the certificate made no reference to any number of partnership units to be sold, and did not contain any condition with respect to the obligation of the limited partners to make additional contributions, as required by § 10-102 (a) (7) of the Uniform Act, if any such conditions were to be imposed.

As heretofore indicated, the purpose of recording the partnership certificate is to acquaint third persons dealing with the partnership with its essential features, including its capital structure. Obviously, to give effect to alleged conditions not set out in, or at variance with, the certificate and partnership agreement is to fatally undermine the operation of the Uniform Act.

The appellees urge that we apply the common law rule, recognized in *Wright v. Lewis,* 161 Md. 674, 158 A. 704 (1932), that an inherent condition of a pre-incorporation subscription

is that the authorized share capital will be fully subscribed and a subscriber will not be held liable on his subscription contract until that condition is fulfilled. The rule was changed as to corporate subscriptions by § 2-202 of the Corporations Article. We think the common law rule is manifestly inapplicable to subscriptions to limited partnerships in view of the provisions of the Uniform Act, at least in the absence of enforceable qualifications to the subscription obligation contained in the partnership documents. As the receiver so cogently observes, unlike the corporation charter involved in *Wright,* the partnership documents contain no statement parallel to that of an authorized capital which could in any way be construed as a condition precedent to formation.

### (3)

The receiver contends that the lower court was in error in its apparent holding that the failure of the general partners to make calls for the additional contributions upon the limited partners, as contemplated by the partnership documents, barred enforcement of those obligations.

Both the original and revised partnership agreement and certificate required additional contributions in accordance with a mortgage payment schedule to be provided by the general partners. The only difference between the original and revised versions is that the former required 4% of a specified mortgage debt, per limited partnership share, to a maximum of $15,298.06, while the latter required a 4% per share payment of an unspecified mortgage debt. No payment schedule relating to the Commercial Credit first mortgage or the Joint Venture second mortgage was ever provided to the limited partners, and no request or demand was ever made upon the limited partners prior to the foreclosure of the Commercial Credit mortgage. No calls were ever made, according to Whitehead, because the amounts that would have been realized from the limited partners could not have been sufficiently supplemented by the general partners to meet the partnership's obligations.

We think that the failure of the general partners to make

calls for the additional contributions, even though contractually contemplated, cannot defeat the interests of creditors to enforce their obligations. Our predecessors have uniformly held in cases involving suits by a receiver of an insolvent corporation to enforce stock subscription agreements that the liability of stockholders for unpaid subscriptions is fixed and no prior demand or call is necessary to permit recovery by the receiver. *Wright v. Lewis,* 161 Md. 674, 158 A. 704 (1932); *Goldstein v. Leitch,* 142 Md. 184, 120 A. 369 (1923); *Crawford v. Rohrer,* 59 Md. 599 (1883). The same rule is applicable by analogy to suits by receivers to recover unpaid capital obligations of limited partners in a limited partnership.

## (4)

The receiver contends that the limited partners were bound by the recorded certificate of limited partnership, even though it was revised by the general partners and Whitehead without their consent, because the general partners and Whitehead were their agents with authority to revise and record the certificate on their behalf.

As we have already noted, a limited partner under the Uniform Act (see Official Comment to § 1 thereof) is not "in any sense" either a partner or a principal in the business or transactions of the partnership. Rather, he is an investor in the partnership venture, without authority to participate in the management of the business; his liability is limited to the amount of his stated capital contribution. The relationship between the general and limited partner is a fiduciary one — a relation of trust — similar to that existing between a corporate director and a shareholder. *See Miller v. Schweickart,* 405 F. Supp. 366 (S.D.N.Y. 1975); *Allen v. Steinberg,* 244 Md. 119, 223 A. 2d 240 (1966); *Lichtyger v. Franchard Corp.,* 18 N.Y.2d 528, 277 N.Y.S.2d 377, 223 N.E.2d 869 (1966). Hence, the general rule would appear to be that the principal-agent relationship which exists between the parties of an ordinary partnership is not per se present between general and limited partners in a limited partnership.

*Donroy, Ltd. v. United States,* 301 F. 2d 200 (9th Cir. 1962); *Lynn v. Cohen,* 359 F. Supp. 565 (S.D.N.Y. 1973); 60 Am. Jur. 2d *Partnership* § 379 (1972). Thus, authority not specifically delegated in the limited partnership agreement to general partners is presumed to be withheld. *Allen v. Steinberg,* 244 Md. 119, 223 A. 2d 240 (1966); *Homestake Mining Co. v. Mid-Continent Exploration Co.,* 282 F. 2d 787 (10th Cir. 1960). These principles are consistent with the provisions of § 10-108 of the Uniform Act, which delineate the rights and powers of a general partner in a limited partnership.[2]

The partnership agreement in the present case specified that the limited partners appointed the general partners as their attorney and agent to execute and record:

> "(1) all certificates and other instruments . . . which the General Partner deems appropriate to qualify or continue the Partnership as a Limited Partnership . . . , (2) all instruments which the General Partner deems appropriate to effect a change or modification of the Partnership in accordance with the terms of this Agreement . . . ."

Despite the broad sweep of the powers which the limited partners agreed to vest in the general partners under the partnership agreement, we hold that the general partners did

---

2. Section 10-108 provides:

"A general partner shall have all the rights and powers and be subject to all the restrictions and liabilities of a partner in a partnership without limited partners, except that without the written consent or ratification of the specific act by all the limited partners, a general partner or all of the general partners have no authority to:

(1) Do any act in contravention of the certificate;
(2) Do any act which would make it impossible to carry on the ordinary business of the partnership;
(3) Confess a judgment against the partnership;
(4) Possess partnership property, or assign their rights in specific partnership property, for other than a partnership purpose;
(5) Admit a person as a general partner;
(6) Admit a person as a limited partner, unless the right so to do is given in the certificate; or
(7) Continue the business with partnership property on the death, retirement, or insanity of a general partner, unless the right so to do is given in the certificate."

not have actual authority to revise the partnership certificate and agreement absent the express consent of the limited partners. That a power of attorney will be strictly construed as a general rule and held to grant only those powers which are clearly delineated is well settled. 3 Am. Jur. 2d *Agency* § 29 (1962). For example, in *United States v. Mansion House Center No. Redev.,* 426 F. Supp. 479 (E.D. Mo. 1977), the issue was whether the general partner was authorized to approve, on behalf of the limited partners, the choice of a replacement general partner. Such authority was claimed pursuant to a partnership agreement by which each limited partner appointed the general partner as his attorney with authority to execute, acknowledge and file any amendments to the partnership documents which were required for the admission of a new general partner. The court, strictly construing the power of attorney, held that this authority related only to ministerial functions and could not be construed to extend to the approval of a new general partner. Similarly, the authority granted to the general partners in the instant case cannot be construed as authority to make any amendments to the certificate and agreement which they thought necessary or desirable. Indeed, the agreement itself provided that amendments thereto must be made by the written, unanimous agreement of all the partners, both general and limited. Considering the agreement in its entirety, it does not appear that the general partners were empowered to revise and record the certificate without the express consent of the limited partners.

Nor is there any basis for holding that the general partners were clothed with apparent authority to alter the documents. Apparent authority results from certain acts or manifestations by the alleged principal to a third party leading the third party to believe that an agent had authority to act. *Reserve Ins. Co. v. Duckett,* 240 Md. 591, 214 A. 2d 754 (1965). *See also B. P. Oil Corp. v. Mabe,* 279 Md. 632, 370 A. 2d 554 (1977). While the appellees did permit the general partners to handle the documents, generally the law will not imply authority to alter from an agency involving the mere handling of an instrument. 4 Am. Jur. 2d *Alteration of*

*Instruments* § 15 (1962). *See also Vanderford v. Farmers' Bank,* 105 Md. 164, 66 A. 47 (1907) (bank cashier who altered the due date on a note had no implied power by virtue of his office to extend the time of payment on the note).

Neither were the appellees bound by the terms of the altered certificate simply because it was recorded. While the recording requirement was meant to protect the public, the Uniform Act does not hold a limited partner liable for any statement contained in a recorded certificate. Section 10-106 of the Uniform Act provides:

> "If the certificate contains a false statement, one who suffers loss by reliance on the statement may hold liable any party to the certificate who knew the statement to be false:
>
> (a)(1) At the time he signed the certificate; or
>
> (2) Subsequently, but within a sufficient time before the statement was relied upon to enable him to cancel or amend the certificate, or to file a petition for its cancellation or amendment as provided in § 10-124 of this title...."

It is thus clear that a limited partner bears responsibility for a false statement in a certificate only if he knew the statement to be false. *Walraven v. Ramsay,* 335 Mich. 331, 55 N.W.2d 853 (1952). There was no false statement as to the contribution of limited partners at the time the instruments of execution were signed by the appellees, nor is there any evidence that they subsequently became aware of the false statement before the creditors had relied upon the certificate, if in fact they did.

Nor was Whitehead the agent of the limited partners. He represented the general partners and the Limited Partnership. His actions with respect to the partnership agreement and certificate were not, therefore, those of an agent acting on behalf of the limited partners.

The receiver next argues that even if the general partners had no authority to revise the partnership documents, they were nevertheless enforceable according to their original tenor, and the limited partners are therefore liable to the

Limited Partnership for the capital contributions which they originally agreed to make. The appellees claim, as the lower court held, that no limited partnership ever came into existence. They say that the receiver's cause of action was based upon the revised partnership agreement and certificate, that these documents resulted from the fraudulent, material alteration of the original partnership agreement and certificate, and significantly increased the business risk of the investing limited partners; as a consequence, the appellees claim that the partnership documents were void, and the receiver is barred from all recovery on behalf of the creditors of the Limited Partnership.

A partnership is, of course, a contractual relation to which the principles of contract law are fully applicable. *Collier v. Collier,* 182 Md. 82, 32 A. 2d 469 (1943); *Abbott v. Hibbitts,* 142 Md. 7, 119 A. 650 (1922); 59 Am. Jur. 2d *Partnership* §§ 19, 33 (1971). An agreement to form a partnership may be made by the parties but such an agreement does not of itself create a partnership. *Maxa v. Jones,* 148 Md. 459, 129 A. 652 (1925). One of the essential elements for formation of a contract is a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms. *Maryland Supreme Corp. v. Blake Co.,* 279 Md. 531, 369 A. 2d 1017 (1977); *Post v. Gillespie,* 219 Md. 378, 149 A. 2d 391 (1959). The failure to agree on or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking. *L & L Corp. v. Ammendale,* 248 Md. 380, 236 A. 2d 734 (1968). Whether a partnership exists is always a matter of fact which must depend on the intention of the parties. *Miller v. Salabes,* 225 Md. 53, 169 A. 2d 671 (1961); *M. Lit, Inc. v. Berger,* 225 Md. 241, 170 A. 2d 303 (1961); *Townsend v. Appel Sons, Inc.,* 164 Md. 255, 164 A. 679 (1933).

That the appellees intended to enter into a limited partnership to acquire the Joint Venture property for investment purposes is entirely clear. It was based upon the understanding, clear from the original proposed partnership

documents, that the property would cost $450,000; that $175,000 was expected to be derived from sales of partnership units and this amount paid in cash at the time of settlement; and that a $265,000 mortgage would be carried on the property. By the terms of the original documents, it was understood that, in addition to their initial contribution of $9,000, the limited partners were each obligated to pay not more than $15,298 to service the $265,000 mortgage debt over the loan period. While nothing in the original partnership documents required the sale of all 25 limited partnership units as a precondition to the formation of the partnership, or guaranteed their sale so as to realize the necessary $175,000 cash payment required at the time of settlement, the contract of sale for the property, which the limited partners ratified, specified that should the Limited Partnership be unable to settle for the property in accordance with the terms of the contract, the $10,000 deposit would be forfeited as agreed liquidated damages and all liability of the buyer thereby terminated. As revised without the consent or knowledge of the limited partners, the capital structure of the venture was so altered that the originally contemplated partnership debt was almost doubled and the individual obligations of the limited partners substantially increased to a 4% share of a greater, unauthorized mortgage debt of $450,000. We think the revised partnership documents so altered the original proposal as to result in an undertaking substantially different from that which the limited partners had contemplated.

The provision of § 10-102 (b) that a limited partnership is formed only if there has been "substantial compliance in good faith" with the requirements of § 10-102 (a) implicates two separate and distinct matters, although "substantial compliance" and "good faith" are closely related and seldom will one exist without the other. *Rowley on Partnership, supra,* at § 53.2. That the revised certificate was in proper form and in substantial compliance with the statutory requirements is plain. As to the "good faith" requirement, Rowley indicates that it may be satisfied where the parties honestly attempt to follow the provisions of the Act to the end that third persons will have notice of the essential features

of the limited partnership. *Id.* at § 53.2. Compliance with the "good faith" requirement of § 10-102 (b) does not require the literal truth of every statement in the certificate; indeed § 10-106 (a) of the Uniform Act takes into account the making of false statements in the certificate, not by inhibiting formation of the limited partnership, but by providing that one who suffers loss by reliance on such a statement may hold liable any party to the certificate who knew the statement to be false when he signed it, or within sufficient time before the statement was relied on to have had the certificate cancelled or amended. Rowley further indicates, however, that "persons who sign, swear to, and file for record a certificate which in any important particular is knowingly false, are not acting in good faith ... [and that] no limited partnership should be deemed formed thereby." *Id.* at § 53.2.

We think the unauthorized changes in the substituted certificate were not mere false statements within the contemplation of § 10-106 (a), but were of such a fundamental character as affected the formation of the limited partnership itself. We hold, therefore, that the filing of the revised certificate did not comply with the "good faith" requirement of § 10-102 (b) and that consequently no limited partnership was created under the statute.[3] In so concluding, we note that Fulton clearly realized that he had no authority to revise the partnership documents without the consent of the appellees since he told Whitehead that he would obtain their consent to the intended changes. That he did not do so, but instead arranged the loan through Commercial Credit, and presumably made the necessary accommodation with the Joint Venture, without informing the appellees, indicates that the certificate was not filed in the honest but mistaken belief

3. In 1976, the Commissioners on Uniform State Laws drafted a Revised Uniform Limited Partnership Act. Section 201 of the Revised Act eliminates the "good faith" requirement of § 10-102 (b) of the Uniform Act; it provides that a limited partnership is formed if there has been "substantial compliance" with the statutory requirements pertaining to the filing of the certificate of limited partnership. As yet, the Revised Act has not been adopted by any state.

that he had authority to file it without the consent of the limited partners.[4]

The Uniform Act does not provide an explicit rule of law which is ultimately dispositive of this controversy. Section 10-127 of the Act specifies, however, that "[i]n any case not provided for in this title the rules of law and equity, including the law merchant, shall govern." The Uniform Partnership Act, Title 9, §§ 9-109 through 9-703 of the Corporations Article, provides in § 9-101 (f) that its provisions are applicable to limited partnerships "except insofar as the statutes relating to such partnerships are inconsistent with this title." Since § 9-702 (b) of the Uniform Partnership Act provides that "[t]he law of estoppel shall apply under this title," this provision is plainly applicable to limited partnerships. More specifically, § 9-308 (a) entitled "Partner by estoppel" provides:

"When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to anyone, as a partner in an existing partnership or with one or more persons not actually partners, he is liable to any such person to whom the representation has been made, who has, on the faith of the representation, given credit to the actual or apparent partnership, and if he has made the representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to the person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made."

---

4. We do not think that Anthony ratified the partnership documents, as revised, because of his subsequent election not to rescind his limited partnership subscription. While the notice of the asserted "right" to rescind supplied particularized information with respect to the changes made in the documents, it did not, in our opinion, provide information sufficiently full and complete to justify a conclusion that Anthony ratified the revised partnership agreement and certificate. *See, e.g.,* Adamstown Canning Co. v. B. & O. R.R., 137 Md. 199, 112 A. 286 (1920).

That there may be a partnership by estoppel as to third persons, even though the parties are not partners *inter se,* is well recognized by our cases. *See Vlamis v. De Weese,* 216 Md. 384, 140 A. 2d 665 (1958); *McBriety v. Phillips,* 180 Md. 569, 26 A. 2d 400 (1942); *Brocato v. Serio,* 173 Md. 374, 196 A. 125 (1938); *Southern Can Co. v. Sayler,* 152 Md. 303, 136 A. 624 (1927); *West v. Driscoll,* 142 Md. 205, 120 A. 445 (1923); *Lighthiser v. Allison,* 100 Md. 103, 59 A. 182 (1904). *See also* 59 Am. Jur. 2d *Partnership* §§ 67-76 (1971). Under these cases, the ground of liability of a person as a partner, who is not so in fact, is that he has held himself out to the world as such, or has permitted others to do so and, by reason thereof, is estopped from denying that he is a partner as against those who have, in good faith, dealt with the firm or with him as a member of it.

The lower court did not consider these estoppel principles in exonerating the appellees from all liability to the receiver. Of course, it had no occasion to do so because the receiver's action was based on the validity of the revised partnership documents, it not being known to the receiver or counsel for the appellees until trial that the original partnership documents were in existence. Whether Commercial Credit made its mortgage loan to the Limited Partnership on the basis of the underlying collateral and the general liability of Fulton and Rinaldi, without regard to the participation of the limited partners, was not an issue in the case to which evidence was addressed at trial. The same is true with respect to the second mortgage of the Joint Venture. Although no such finding was necessary to its decision, the lower court expressed the belief that the Joint Venture, in extending credit, detrimentally relied upon a representation that the limited partners were members of the Limited Partnership, while Commercial Credit did not. In view of the pleadings and the posture of the case at trial, the receiver had no reason to anticipate a need to produce evidence of reliance upon the participation of the limited partners in the partnership venture, and he did not do so. Of course, the facts upon which to rest an estoppel must be proved; they will not be presumed. *Miller v. Salabes,* 225 Md. 53, 169 A. 2d 671 (1961).

Under Maryland Rule 871 a, if it appears to us "that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment from which the appeal was taken, or that the purposes of justice will be advanced by permitting further proceedings in the cause, either through amendment of the pleadings, introduction of additional evidence, making of additional parties, or otherwise," we may order the case remanded for further proceedings. We think that rule is appropriately invoked in this case to permit further proceedings "as may be necessary for determining the action upon its merits as if no appeal had been taken and the judgment from which the appeal was taken had not been entered . . . ." Rule 871 a. Upon remand, the receiver is to be afforded the fullest opportunity to amend his pleadings, and adduce evidence in an effort to establish responsibility of the appellees for an amount equal to their capital contributions under any contract, estoppel, or other theory of liability arising from the appellees' execution of the partnership documents which is not inconsistent with the views herein expressed.

### (5)

The appellee Anthony defends the lower court's judgment exonerating him from liability for the initial contribution refunded to him on the ground that the three-year period of limitations had run against the receiver before suit was filed. None of the other appellees advances this contention; as to them there is no dispute that they executed the partnership documents under seal and that the 12-year limitation period prescribed in Code (1974), § 5-102 of the Courts and Judicial Proceedings Article is applicable.

While there are several reasons for holding Anthony's claim to be without merit, the short answer is that he did execute the documents under seal. The partnership share in question — that jointly subscribed to by Anthony and Christ — shows that the single signature line on the instruments of execution appended to the certificate and agreement contained the word "Seal." This was consistent with the

recitals in the agreement and certificate that the parties "set their hands and seals" to these instruments. Christ signed the "instruments of execution" on the signature line, and Anthony signed immediately beneath Christ's signature. The two signatures were joined together by brackets, and the words "as tenants in common" were added immediately adjacent to the two signatures. The obvious intent was that the legal effect of both signatures would be coextensive. In *Federalsburg v. Allied Con.,* 275 Md. 151, 338 A. 2d 275 (1975), we noted with approval the following statement of the Maryland law set forth by Judge Chesnut in *General Petroleum Corp. v. Seaboard Terminals Corp.,* 23 F. Supp. 137, 140 (D. Md. 1938):

> " 'If the contract is signed by an *individual* opposite and in obvious relation to a legally sufficient seal, the instrument will be taken as a sealed document, where there is nothing on the face of the paper to indicate the contrary even though there be no reference to the seal in the wording of the paper. "A recital of the sealing or of the delivery of a written promise is not essential to its validity as a sealed contract." . . . . "A promisor who delivers a written promise to which a seal has been previously affixed or impressed with apparent reference to his signature, thereby adopts the seal." . . .' " 275 Md. at 156 (Citations omitted; emphasis in original).

The law with respect to the effect of a corporate seal on contracts is different. *See Gildenhorn v. Columbia R. E. Title,* 271 Md. 387, 317 A. 2d 836 (1974); *Federalsburg, supra.*

> *Case remanded without affirmance or reversal pursuant to Maryland Rule 871 a for further proceedings in accordance with this opinion; costs to abide the result.*